514 P.2d 752

Fay I. MORTON, Administratrix with will annexed of the Estate of Carl B. Morton, Deceased, and Scope International, Inc., an Arizona corporation, Appellants,

v.

Wanda J. ROGERS, a divorced woman; and Wayne Fisher, Appellees.

No. I CA–CIV 1700.

Court of Appeals of Arizona, Division 1, Department A.

Sept. 13, 1973.

Rehearing Denied Oct. 30, 1973.

Review Denied Nov. 27, 1973.

Charles M. Brewer, Ltd., by Charles M. Brewer and Herbert Mallamo, Phoenix, for appellants.

Richard J. Herbert, Phoenix, and Julius Lucius Echeles, Chicago, Ill., for appellee Wanda J. Rogers.

## OPINION

DONOFRIO, Presiding Judge.

This is an appeal by the estate of Carl B. Morton, which appeal is restricted to the issue of whether a $24,000 judgment in favor of one Wanda J. Rogers against the estate of Carl B. Morton was sustained by the evidence and applicable law.

In reviewing the evidence presented in this case in a light most favorable to upholding the judgment, we find the facts to be as follows. Wanda J. and Harry H. Rogers, during their marriage were the principal officers, directors and stockholders of H. H. Rogers Company, an Illinois corporation, which manufactured and distributed chemical solutions and solvents used to clean printing presses, type, rollers

and other machinery employed in the printing and graphic arts industry. These products were sold under the trade name "Rogersol" and were manufactured from formulae originated or developed over a number of years by Harry H. Rogers and were considered by him to be "trade secrets."

In December 1967, as an incident to their divorce settlement, Harry H. Rogers, by written agreement, gave Wanda J. Rogers the possession and use of the formulae for the purpose of manufacturing and selling "Rogersol" products in eleven western states. Both Wanda J. and Harry H. Rogers solicited appellant-decedent, Carl B. Morton to organize, finance and operate a new corporation (Scope International) formed for the purpose of making and distributing the solvents.

Wanda became president and a director of Scope, and Carl B. Morton was secretary-treasurer and a director. Each purchased 5,000 shares of stock at $1.00 a share, and each agreed to contribute equal amounts of any additional money needed thereafter. Wanda later put in an additional $5,500 and Carl B. Morton contributed an additional $5,000. Each party co-signed a note at the Arizona Bank for an additional $5,000, making a total investment by both Wanda J. Rogers and Carl B. Morton of about $25,000 in May or June of 1968.

In order to commence the manufacture of the solvents, Wanda's brother, Wayne Fisher, was employed to compound the formulae and, under agreement with Harry Rogers, was sent to H. H. Rogers Company's plant in Chicago for training. He stayed in Chicago for about six weeks at Scope's expense. At the end of this training period he returned with certain of the formulae and undertook the preparation of solvents and filling of orders for Scope. He was told by Wanda (while she was still living in Chicago) to safeguard the formulae, and for this purpose he put a small hasp and padlock on his desk drawer where he kept the formulae when not in use. He retained the only key to the padlock. On occasion, however, it became necessary for Fisher to show certain of the formulae to Morton in order to enlist his assistance to break down the components to make smaller or larger batches required to fill a particular order.

Shortly after the inception of the business, on or about July 9, 1968, Carl B. Morton broke into the locked desk drawer, removed the formulae and made photostatic copies of them. This event caused Wanda to walk out, taking the formulae and her brother with her. Morton retained the photostatic copies of the formulae which the court found were used by him to manufacture and sell solvents through M & M Ink Co., a sole proprietorship owned by Morton, and with M & M's brand names.

Wanda subsequently resigned her office as president and refused to have anything further to do with Scope, or to permit Wayne Fisher to return to his employment with Scope. She eventually commenced an action in Maricopa County Superior Court against Carl B. Morton and Scope International for damages and to restrain and enjoin them from divulging the contents of the formulae, and to require the copies to be returned to her.

Morton and Scope, within a few days thereafter, commenced an action against Wanda J. Rogers, Harry H. Rogers, Wayne Fisher, H. H. Rogers Co., Inc., and International Rogersol Corporation, alleging said defendants had entered into a conspiracy to restrain, harass and eliminate Scope International from competing in the solvent business, and further alleging interference with the contractual relationship existing between Wanda J. Rogers, Carl B. Morton and Scope International, and sought to recover damages therefor.

Harry H. Rogers, Rogers Co. and Rogersol then filed a counterclaim and cross-claim seeking to restrain and enjoin Carl B. Morton from manufacturing and selling solvents utilizing the "trade secrets" and formulae and to require that he surrender any copies thereof, and for a de-

claratory judgment adjudicating that the agreement of December 1967 between Rogers, Rogers Co., et al., and Wanda Rogers had been breached, thereby becoming void.

After trial on the merits to the court sitting without a jury, the court took the matter under advisement and then entered some 26 findings of fact, 10 conclusions of law and a judgment. During the interval between conclusion of trial and entry of judgment Carl Morton met his death. The trial court found, *inter alia*, for Harry H. Rogers and H. H. Rogers Co. on the cross-claim against the estate of Carl B. Morton, Scope International and Wanda J. Rogers, and for Wanda J. Rogers against the estate of Carl B. Morton, awarding her the sum of $24,000 pursuant to a corrected judgment.

The estate of Morton raised the following questions for review in this appeal:

1) Whether certain findings of fact (notably Nos. 2, 10, 11, 12 and 24) and certain conclusions of law (notably I, V, VI and VIII) are supported by the evidence and applicable law; and

2) Whether the $24,000 judgment in favor of Wanda (finding of fact No. 25 and conclusion of law No. IX) is sustained by the evidence.

It should be noted that appellant's brief named a number of appellees but its contention on appeal is concerned only with Wanda J. Rogers' damage award. All of the appellees, except Wanda Rogers and Wayne Fisher, moved to dismiss the appeal, which motion was granted by this Court.

Briefly, those findings and conclusions with which appellants have taken issue enunciate the following:

The blending directions and formulae developed by Harry H. Rogers were found to be trade secrets. They were kept locked in safe places and only a limited number of the trusted employees of Harry H. Rogers were permitted access to them. The formulae were of the type not generally known in the trade and their composition

was not easily discovered by chemical analysis. Carl B. Morton and Scope were found to be without access to, or knowledge of the trade secrets, although Morton had been provided with some information for limited purposes.

The method of blending the ingredients was found to be crucial to their compounding. Harry H. Rogers had taken all reasonable precautions to maintain the secrecy of the trade secrets and formulae. Further, the court found that Wanda did not agree with Morton or Scope to disclose to Morton the trade secrets and formulae made available to her under the divorce settlement agreement, nor did she assign, transfer or otherwise convey any rights she had under that agreement. In addition, the court found that prior to the agreement between the Rogers giving her the right to sell Rogersol products in the eleven western states, the H. H. Rogers Company had made sales averaging $33,000 per year in that region, with anticipated increased sales and a high profit margin.

In other findings of fact, not questioned by appellants, the court found that Morton had taken some $11,000 of the funds received by Scope from the sale of Rogersol products and put it into M & M Ink Co. and, as previously stated, that he was using the formulae to make solvents to be sold through M & M Ink Co. In his conclusions of law the trial court judge determined that Morton's conduct in secretly and forcibly obtaining the copies was unauthorized and wrongful, and that as a result of the wrongful acts of Carl B. Morton, Wanda J. Rogers' investments in Scope and her loans to the corporation became worthless. The court then determined her damages to be $24,000.

Appellants initially argue that the evidence does not sustain the trial court's holding that the formulae were trade secrets, and even if they were, that Wanda had assigned all right and title to them.

An accepted definition of "trade secret" is found in the Restatement of

Torts, Sec. 757, Comment b, which states in relevant part:

> *"Definition of trade secret.* A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers."

*See also,* E. I. Du Pont De Nemours and Company v. United States, 288 F.2d 904 at 911, 153 Ct.Cl. 274 (1961). From the evidence at trial it could reasonably be concluded that, at least in their initial stage, the formulae and blending directions were indeed "trade secrets."

Harry H. Rogers admitted that about 12 years prior to trial, former employees of his had joined forces to form a firm called Rycoline Company. That firm makes products which are similar to the "Rogersol" solvents. The Rogers have also revealed the formulae to other firms pursuant to trade licensing agreements.

■ Although Rycoline was trying to duplicate its products, Rogers testified it had failed essentially "because they didn't have the complete formulation." The trade secrets in this case were of such a nature that not only the ingredients that went into making the solvents (which Rycoline apparently had), but also the correct amounts of each ingredient and the particular procedures for mixing and manufacturing the solvents, comprised the secrets. From the evidence presented, we find that the trial court could have reasonably concluded that Rycoline's activities had not exposed the formulae and blending directions to public scrutiny, and were still trade secrets. Moreover, a limited publication of the formulae to others pursuant to certain trade agreements does not render them public information. *See* 2 Callman, Unfair Competition Trademarks and Mo-

nopolies (3rd Ed.1968), Sec. 53.3(d) at 401–403.

In arguing that Wanda assigned to them the rights to use and to know the contents of the formulae, the appellants cite to us the December 1969 agreement between Harry H. Rogers, et al., and Wanda J. Rogers wherein Wanda was given the right ". . . to manufacture and sell Rogersol products and Harry H. Rogers Company, Inc. products in the [eleven] western states. . . ." The agreement also provided: "This permission is granted to any company or corporation formed by Wanda Rogers."

■ The fact that an agreement between Wanda J. Rogers and Harry H. Rogers and his corporations, whereby Wanda was granted authority to manufacture and sell the company's products, envisioned that she had assignment rights concerning said authority and permission is not conclusive or even persuasive as to her later actual legal relationship with Morton and Scope. Because she possessed the right to assign does not mean that she exercised that right.

■ The crux of appellants' argument in this regard is that the facts of the case indicate that there was a so-called "equitable assignment" of Wanda J. Rogers' rights to the formulae to Carl B. Morton and/or Scope International. In 6 C.J.S. Assignments § 58(a), at p. 1101, is the following proposition:

> "An assignment which a court of equity will recognize and which a court of law will not constitutes an equitable assignment; it being implied from the circumstances and because of the equities involved, and recognized solely because the assignee is a purchaser for value. No particular form is necessary to constitute an equitable assignment, and any words or transactions which show an *intention on the one side to assign* and an intention on the other side to receive, if there is a valuable consideration, will operate

as an effective equitable assignment, even though the instrument assigned is a specialty. . . ." (emphasis added)

Similarly, in Allen v. Hamman Lumber Co., 44 Ariz. 145, 34 P.2d 397 (1934), our Supreme Court said:

". . . Any language, however informal, which shows *an intention of an owner of a chose in action to transfer it* so that it will be the property of the transferee will amount to an equitable assignment if sustained by a sufficient consideration." 44 Ariz. at 148, 34 P.2d at 399. (emphasis added)

Thus, the intent of the parties governs whether an equitable assignment has been made. Such intent can, of course, be established both by word and deed. The uncontroverted evidence is that Fisher was the sole custodian of the formulae and he alone was trained to properly mix the ingredients to make the solvents. Except on rare occasions he alone manufactured the solvents. Wanda's instruction to Fisher to keep the formulae under lock and key clearly indicates that she intended to keep the compositions of the formulae secret and not to assign them to anyone. The court could have reasonably inferred that Wanda J. Rogers only intended to permit Scope to obtain the benefits of the formulae's use on her terms, not to make a blanket assignment of her rights in them to anyone. The evidence amply supports the trial court's finding that Wanda J. Rogers' rights to the formulae were entitled to protection from the court.

■ Appellants further argue that the evidence does not sustain the finding that Carl Morton committed a wrongful act when he broke into the desk, removed the formulae and copied them. Their position rests on the assertion that Morton, as a corporate director and 50% stockholder, had the right to examine those formulae as part of his general right to examine the corporate books and records. Corporate books and records generally subject to inspection include the transcript of charter and by-laws, minutes of meetings, account books regarding official doings, and written evidence of business transactions. 18 Am.Jur.2d, Corporation § 174, at 704–705. This right does not necessarily extend to formulae, however. In fact, the right of inspection does not extend to "trade secrets", especially when one's motivation is to help competitors of the corporation, or for his self-interest. *See* Annot. 15 A.L. R.2d 11, at 68 (1951), and the cases cited therein. Morton's surreptitious conduct in forcibly breaking into the locked desk drawer where the formulae were kept reasonably sustains the trial court's conclusion that he acted wrongfully in making the copies.

While we have found that the record contains reasonable evidence to support the trial court's findings of appellant Morton's culpability, Rule 52(a), Arizona Rules of Civil Procedure, 16 A.R.S., we also find that the evidence in the record is insufficient to support an award of $24,000 in damages.

■ Generally, a plaintiff must establish his damages with reasonable certainty. Jacob v. Miner, 67 Ariz. 109, 191 P.2d 734 (1948). The only evidence as to the damages sustained was that there was some prior history of sales of Rogersol products in the eleven western states totaling $33,000, and Wanda J. Rogers' claim that she had lost a salary of $1,000 per month from Scope over a two-year period. Wanda testified that if Scope were to gross $33,000 per year from its sales it could anticipate a profit of $24,000 per year. This profit margin was predicated merely on the difference between the cost of materials and the receipts from the sales. Proof of loss of profits generally requires some degree of definiteness. Isenberg v. Lemon, 84 Ariz. 364, 329 P.2d 882 (1958). The testimony concerning Scope's potential profit picture is too speculative to support the judgment in this case. Coury Bros. Ranches, Inc. v. Ellsworth, 103 Ariz. 515, 446 P.2d 458 (1968). Furthermore, the record failed to demonstrate whether some basis was established

for a transference from Scope to Morton of the salary obligation to Wanda.

We therefore reverse the trial court concerning the $24,000 judgment, with directions for a new trial solely on the question of damages.

OGG and STEVENS, JJ., concur.