708 P.2d 742

**Dale K. DOMBEY and Billie Jo Dombey, his wife; and Dombey, Inc., an Arizona corporation, Plaintiffs-Appellees,**

v.

**PHOENIX NEWSPAPERS, INC., an Arizona corporation; and Bill Ahrens, Defendants-Appellants.**

1 CA–CIV 6437.

Court of Appeals of Arizona, Division 1, Department C.

Jan. 15, 1985.

Reconsideration Denied March 21, 1985.

Review Denied Sept. 4, 1985.

Marton & Hall, P.A. by Kraig J. Marton and Andrews, Marenda & Moseley, P.A. by William Andrews and Cunningham, Tiffany & Hoffman by John Goodson, Phoenix, for plaintiffs-appellees.

Gust, Rosenfeld, Divelbess & Henderson by James F. Henderson, Jeffrey A. Ekbom, Phoenix, for defendants-appellants.

## OPINION

OGG, Judge.

Appellants bring this appeal from jury verdicts entered against them in favor of appellees Dale K. Dombey, Billie Jo Dombey, and Dombey, Inc. The jury returned a verdict in favor of Dale K. Dombey and Billie Jo Dombey and awarded them $100,-000.00. The jury further awarded $500,-000.00 to Dombey, Inc., an Arizona corporation. Both verdicts were against Phoenix Newspapers, Inc., an Arizona corporation, and Bill Ahrens, a reporter for Phoenix Newspapers, Inc. The verdicts are premised upon defamatory publications concerning Dale Dombey and Dombey, Inc. The issues raised by appellants are summarized as follows:

1. Were appellants entitled to a directed verdict against Dale Dombey because he was a public official?

2. Were appellants entitled to a directed verdict against Billie Jo Dombey because the articles were not of and concerning her?

3. Were appellants entitled to a directed verdict against Dombey, Inc. because the corporation was not libeled?

4. Was the jury verdict of $500,000.00 in favor of Dombey, Inc. based upon speculation, conjecture, passion or prejudice and not supported by the evidence?

## FACTS

We begin by reviewing the facts. Appellee Dale Dombey began his career as an insurance agent in 1963. In 1965 he implemented life and health insurance programs for Maricopa County employees. Dombey was subsequently appointed "agent of record" for health and life insurance for Maricopa County. Dombey was not a county employee; he was compensated in the form of commissions from whichever insurance carriers were chosen for the various programs implemented. Although the position of agent of record was an annual political appointment, Dombey had been appointed each and every year from 1969 through 1979. Dombey's responsibilities as agent of record included developing insurance programs and submitting them to the county Insurance Advisory Committee. Generally, he would present several alternative plans and advise the committee as to each. The committee would choose a particular plan and make its recommendation to the Board of Supervisors. The Board of Supervisors had ultimate control over which plans, if any, were to be implemented.

Dombey was not a member of the Insurance Advisory Committee, although he was responsible for advising the committee on all health and life insurance matters. Additionally, Dombey would explain the various proposals to the Board of Supervisors to aid them in reaching a decision. Dombey would receive commissions from whichever carriers the Board of Supervisors ultimately chose.

In addition to being agent of record for life and health insurance, Dombey was also appointed to the position of plan administrator for the county's deferred compensation plan in 1974. As plan administrator, Dombey was one of five members of the Deferred Compensation Committee. Dombey also set up various plan options for county employees who desired to participate in a deferred compensation plan. Once again, Dombey was not compensated by the County, but received commissions from whichever institutions county employees invested their funds with. Again, the Board of Supervisors ultimately decided which options would be made available to county employees participating in the deferred compensation program. However, the Board relied heavily on Dombey's expertise and recommendations.

As previously noted, Dale Dombey was listed as agent of record for life and health insurance, as well as plan administrator for the deferred compensation program. However, Dombey had incorporated in the early 1970s under the name R.W. Grange Limited. Thus, the corporation received all compensation and carried on the insurance business. Dale Dombey was, in effect, an employee of the corporation.

In addition to the county insurance business, Dale Dombey sold insurance to other governmental entities, as well as to the public in general. Thus, his position as agent of record for Maricopa County provided only a portion, albeit a significant portion, of his total income.

Approximately two or three years after incorporating, Dombey sold fifty percent of the corporation's stock to Wesley Arnold. In 1975, Arnold exercised an option to "buy-out" Dombey's remaining fifty percent share of the corporation's stock. Apparently Arnold's exercise of the buy-out option was triggered by a heart attack suffered by Dombey. The buy-out agreement provided that Arnold would purchase Dombey's stock gradually over a period of ten years, making quarterly payments totaling $258,000.00. Under the terms of the buy-out agreement, Dombey retained the

Maricopa County insurance business, as well as that of several other governmental agencies. Approximately six to eight months after Arnold exercised the buy-out option, Dombey incorporated the remainder of his insurance business under the name Dombey, Inc.

In October of 1977, Dombey hired Donald Jones as a salesman, with the intent of training him and bringing him into the business as a partner. The following month, Dombey suffered another heart attack, after which he transferred all of the stock of Dombey, Inc. to Donald Jones through a buy-out agreement. The agreement provided that Dombey would receive diminishing percentages of the corporation's income over a ten-year period, beginning at 75 percent and ultimately reducing to 25 percent at the end of ten years. Dale Dombey no longer worked for Dombey, Inc. after Jones took over the business except for occasional consultations concerning management of Dombey, Inc. or advice on specific insurance problems. However, Dombey remained agent of record for Maricopa County life and health insurance and plan administrator for the deferred compensation program, although Jones acted as Dombey's representative in handling county insurance matters.

The eighteen articles upon which appellees brought suit were published in the Arizona Republic and Phoenix Gazette in March and April of 1979. Initially, the articles concerned conflict of interest allegations against then County Manager Charles Miller. Dombey was named as an investment partner and longtime friend of Miller's, as well as the man in "control" of Maricopa County's life and health insurance programs. Subsequent articles insinuated that Dombey had made excessive commissions from the life and health insurance programs and particularly from the deferred compensation program.

## PUBLIC OFFICIAL

Appellants initially contend that Dale Dombey was a public official under *New York Times Company v. Sullivan*, 376

U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. Accordingly, Dombey would be required to prove "actual malice" on the part of appellants as a prerequisite to recovering damages for libelous publications. *See New York Times v. Sullivan, supra.* The trial court ruled that Dale Dombey was not a public official.

 Initially we must determine the appropriate standard of review applicable in reviewing the trial court's conclusion. The issue of whether Dale Dombey was a public official is one of federal constitutional fact. *See Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). Accordingly, as an appellate court we are authorized to conduct a *de novo* review of the record and make an independent determination as to whether Dale Dombey was a public official. *See Bose Corporation v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Rosenbloom v. Metromedia, supra.*

 The United States Supreme Court first set forth the standard to be applied in defamation actions brought by public officials in the case of *New York Times Company v. Sullivan, supra*, holding that:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

276 U.S. at 279, 84 S.Ct. at 726, 11 L.Ed.2d at 706. Subsequently, in the case of *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), the Supreme Court provided some general guidelines for deciding whether a particular individual constitutes a public official:

> There is, first, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues.

Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized. It is clear, therefore, that the "public official" designation applies *at the very least* to those among the hierarchy of *government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.* (emphasis added) 383 U.S. at 85, 86 S.Ct. at 675–76, 15 L.Ed.2d at 605.

Clearly Dale Dombey was not a government employee. However, appellants point out that case law subsequent to *Rosenblatt* has indicated that an individual may be considered a public official despite the lack of an employer-employee relationship with a governmental unit. *See Jenoff v. Hearst Corporation,* 644 F.2d 1004 (4th Cir.1981); *Hodges v. Oklahoma Journal Publishing Company,* 617 P.2d 191 (Okla.1980). The court in *Jenoff v. Hearst Corporation, supra,* noted:

It is *conceivable* that an individual holding no formal public position, and standing in no employment or even contractual relationship with government, nevertheless *may participate in some governmental enterprise to such an extent that the policies underlying New York Times Co. v. Sullivan, supra, would demand that he or she be classified a public official.* (emphasis added)

644 F.2d at 1006.

Many cases have been brought to our attention by counsel; however, in only one was a non-government employee or officeholder found to be a public official. In *Hodges v. Oklahoma Journal, supra,* Hill Hodges, a former Oklahoma County license tag agent, was found to be a public official under the *New York Times* standard. In so holding, the Supreme Court of Oklahoma noted:

Clearly, appellant is not an elected official, and any designation of him as a "public official" must be based upon the approach recognized in *Rosenblatt, supra.* It is not denied that as tag agent appellant held a position of *substantial public impact,* and had duties which involved the *collection and accounting for substantial amounts of public funds,* as well as *administering* an area of the law which *affected practically every citizen of Oklahoma County,* the area in which he served.

Despite this broad range of public duties and responsibilities and the impact his performance of those duties had upon the public, appellant contends he was not a "public official" or government "employee" but an *"independent contractor"* and the "public official" standard adopted in *New York Times* would not be applicable to him.

The phrase "governmental employee" as used in the test articulated in *Rosenblatt* was not intended to limit it to those individuals who have a traditional "employee-employer" relationship with a governmental unit. It extends to those who have, or appear to have, substantial responsibility for or control over the conduct of governmental affairs and the alleged libel must relate to this official capacity. The trial court properly determined that appellant was a "public official" within *New York Times.* (emphasis added)

617 P.2d at 193–94.

In the case at bar, Dale Dombey had a good deal of influence over which life and health insurance programs the county would choose to make available to its employees. Public funds were expended on those programs ultimately chosen by the Board of Supervisors. However, it was the Board of Supervisors and not Dombey that possessed control of, and responsibility for, the expenditure of public funds. Moreover, the choice of life and health insurance programs directly affected only those county employees enrolled in the programs. The same is true of the deferred compensation program, which involved no public funds and very few county employees. We do not believe that Dale Dombey's position

was of "such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *Rosenblatt v. Baer, supra,* 383 U.S. at 86, 86 S.Ct. at 676, 15 L.Ed.2d at 606.

Accordingly, we find that the trial court properly found that Dale Dombey was not a public official.

## BILLIE JO DOMBEY

Appellants assert that Dale Dombey's wife, Billie Jo Dombey, was not a proper party to the defamation action because none of the publications defamed her. Appellants maintain that any damages resulting from the publications were personal to Dale Dombey and they do not flow to the marital community. Moreover, appellants claim that joinder of Billie Jo quite possibly prejudiced the jury, thereby requiring that the verdict of $100,000.00 in favor of the Dombeys, as private individuals, be set aside.

■ As part of his damages, Dale Dombey claimed "financial injury" resulting from the defamatory publications. Clearly, loss of income resulting from damage to Dombey's reputation in the insurance field would constitute an injury to the marital community. *See Jurek v. Jurek,* 124 Ariz. 596, 606 P.2d 812 (1980); *see also,* de Funiak and Vaughn, *Principles of Community Property* § 82 (2d ed. 1971). Thus, Billie Jo Dombey was a proper, though not a necessary or indispensable, party. *See Garver v. Thoman,* 15 Ariz. 38, 135 P. 724 (1913); *see also,* de Funiak and Vaughn § 124 at 310.

The trial court properly instructed the jury as to Billie Jo Dombey's interest in the action as follows:

Billie Jo Dombey is a party to the lawsuit solely because of her community property interest in a recovery, if any, by Dale Dombey. She claims no damage other than her community property interest in any verdict.

Billie Jo Dombey was a proper party to the lawsuit.

## DOMBEY, INC.

■ Appellants argue that Dombey, Inc. was not libeled because the articles were "of and concerning" Dale Dombey individually and not the corporation. Appellants point out that only once is Dombey, Inc. mentioned in any of the eighteen articles. In that instance, reference is made to the records of Dombey, Inc. which reflected $59,464.00 in commissions made by Dombey from the deferred compensation plans through 1978. Appellees do not allege that the above was defamatory. Rather, appellees assert that the April 21, 1979 article, read in its entirety, clearly defames the corporation by asserting that agents of Dombey, Inc. were paid exorbitant commissions at the expense of county employees enrolled in the deferred compensation plan. (See Appendix C.) Alternatively, appellees assert that, by defaming Dale Dombey, the articles reflect discredit upon the corporation's method of doing business. Since we agree that the articles tend to discredit the corporation's method of conducting business, we need not address the issue of whether the April 21, 1979 article on its face defames Dombey, Inc.

The *Restatement (Second) of Torts,* § 561(a) (1977) provides:

One who publishes defamatory matter concerning a corporation is subject to liability to it

(a) if the corporation is one for profit, and the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it, ...

Comment b to § 561 provides in pertinent part:

A corporation is not defamed by communications defamatory of its *officers, agents or stockholders* unless they also reflect discredit upon the method by which the corporation conducts its business. (emphasis added)

The articles clearly assert that Dale Dombey "controlled" life and health insurance programs for Maricopa County and

received exorbitant commissions from the deferred compensation program. (*See* Appendix A, B and C.) The articles pertain to Dale Dombey's activities at a time when he was an officer and stockholder of Dombey, Inc. Thus, there existed sufficient evidence from which the jury could find that the articles, in defaming Dale Dombey, also reflected discredit upon the method by which Dombey, Inc. conducted its business.

■ Additionally, appellants take the position that any injury to Dombey, Inc. flowed directly from the voluntary resignation of Dale Dombey as agent of record for life and health insurance and plan administrator for the deferred compensation program. Suffice it to say that there exists sufficient evidence in the record from which a jury could find that Dombey's resignations were brought about by the defamatory publications. *See Schnyder v. Empire Metals, Inc.*, 136 Ariz. 428, 666 P.2d 528 (App.1983) (Court of Appeals must consider the evidence in a light most favorable to the prevailing party and must give that party all reasonable inferences arising therefrom).

## DAMAGES AWARDED DOMBEY, INC.

Appellants also argue that the jury's award of $500,000.00 damages to Dombey, Inc. was based upon speculation, conjecture, passion and prejudice.

We have two problems with the jury's award of damages to Dombey, Inc. First, the evidence presented on damages by accountant Paul Finger pertains to loss of income which would have gone to Dale Dombey through the terms of the buy-out agreement between Dombey and Donald Jones. This does not appear to be the proper method of determining damages incurred by the corporate entity, Dombey, Inc. However, appellants did not object on this ground at trial. Thus, were this the only problem with the jury's award of $500,000.00 to Dombey, Inc., we would not hesitate to affirm. *See Brown Wholesale Electric Company v. Safeco Insurance Company of America*, 135 Ariz. 154, 659 P.2d 1299 (App.1982) (matters not present-

ed to trial court cannot be raised for first time on appeal).

■ However, we have a second problem with the damages award; the amount is not supported by the evidence presented at trial. As pointed out by appellees, the drafters of the *Restatement* commented as follows:

A corporation for profit has a *business reputation* and may therefore be defamed in this respect. Thus a corporation may maintain an action for defamatory words that discredit it and tend to *cause loss to it in the conduct of its business*, without proof of special harm resulting to it. (emphasis added)

*Restatement (Second) of Torts*, § 561, comment b. Thus, Dombey, Inc. could collect damages resulting from a "loss to it in the conduct of its business" in addition to any special damages suffered by the corporation. Dombey, Inc. ceased doing business as a result of the defamatory publications and sought lost profits as its special damages. It cannot also claim general damages for injury to its business reputation since any loss in the conduct of its business is necessarily included in its claim for lost profits.

Appellees assert that, although their witness presented evidence of a projected loss of $221,000.00 over the eight years remaining under the buy-out agreement, the projection was very conservative and the jury could have included inflation and county growth in arriving at a figure of $500,000.00. We must reject this assertion.

■ Proof of loss of profits generally requires some degree of definiteness. *Isenberg v. Lemon*, 84 Ariz. 364, 329 P.2d 882 (1958); *Morton v. Rogers*, 20 Ariz.App. 581, 514 P.2d 752 (1973). *See also, Rancho Pescado, Inc. v. The Northwestern Mutual Life Insurance Company*, 140 Ariz. 174, 680 P.2d 1235 (App.1984). Appellants assert that accountant Paul Finger's projections are based upon "speculation, conjecture and assumptions contrary to the facts and the evidence." Paul Finger testified that he has handled all of the accounting of

Dombey, Inc. since the corporation was formed in 1975. Finger kept the financial books for Dombey, Inc. The books were kept on the "cash method" basis of accounting to record information for taxing authorities and for management. Finger stated that he did not attempt to keep track of the corporation's income by customer sources, although he was able to separate income from Maricopa County insurance commissions and "other" insurance commissions and income. Finger also testified that the information he utilized in maintaining the corporation's books would not be satisfactory evidence for a certified audit. However, he testified that the cash method of accounting is satisfactory for purposes of filing income tax returns and is the most often used accounting procedure for service businesses such as Dombey, Inc. Finger prepared income schedules for fiscal years 1977–1981, setting forth the income received by Dombey, Inc. over those five years. Finger further divided the income for each fiscal year into five categories: (1) income from the buy-out agreement with Wesley Arnold; (2) disability income from Manufacturer's Life Insurance Company; (3) overhead expense allowance; (4) commissions arising from Maricopa County insurance programs; and (5) insurance commissions and income from "other" sources. Finger then took the income figures from categories four and five above for the fifteen month period of January 1, 1978 through April 1, 1979. This was the period in which Donald Jones operated the business of Dombey, Inc. Finger next averaged the 15-month income figures to arrive at a monthly income attributable to categories four and five. He then multiplied the monthly figure by 12 to come up with an annual income. Next, Finger took 25 percent of each category, representing the amount payable to Dale Dombey under the terms of his buy-out agreement with Donald Jones. This resulted in an annual loss of income of $16,955.00 attributable to Maricopa County insurance commissions and $10,670.00 attributable to "other" sources. Finger then multiplied these figures by the eight years remaining under the terms of

the buy-out agreement and added the totals to arrive at a total loss of approximately $221,000.00. Admittedly the projection is based upon the premise that Dale Dombey remained agent of record for life and health insurance as well as plan administrator for the deferred compensation program. However, Dombey had been agent of record for ten or more years at the time the articles were published, and the jury could reasonably conclude that he would have retained the position *but for* the publications.

There does seem to be a question as to whether expenses should be deducted from the projected loss of $221,000.00. Under the terms of the buy-out agreement, overhead expenses were to be borne in proportion to income distributed, that is, Donald Jones would be responsible for 75 percent of the expenses and Dombey, Inc. for 25 percent. However, Paul Finger testified that he did not factor into the projected lost income the overhead expense allowance which would flow through Dombey, Inc. Despite the expense allowance, it appears from the record that a substantial amount of the projected loss of $221,000.00 would have gone to overhead expenses. During cross-examination, Paul Finger testified as follows:

Q. And as a practical matter, the expenses of that business according to Mr. Jones were running about 50 percent of the income. Would that comport with your knowledge of their books and records?

A. Which would include salaries and pension contributions for the owners of the business.

Q. Yes.

A. Yes, that's correct.

The overhead expense allowance received by Dombey, Inc. in fiscal 1978 was $19,-983.99, while the total income attributable to commissions from county insurance and commissions from "other" sources totaled $122,484.19. In fiscal 1979, the figures were $17,616.56 and $91,752.90, respectively. Thus, the overhead expense allowance was well below 50 percent of the corpora-

tion's income. Consequently we would find it difficult to affirm a verdict equal to the projected loss of $221,000.00, let alone a verdict of $500,000.00.

■ Appellees' argument that the jury could have considered Paul Finger's testimony that the projected loss figure of $221,000.00 was "conservative" and then included their own estimate of inflation and county growth thereby arriving at a figure of $500,000.00 must be rejected. Such action on the part of the jury would constitute pure speculation. There was absolutely no evidence presented concerning county growth or future increase in Dombey, Inc.'s business. Dale Dombey's testimony that Paul Finger's $221,000.00 projected loss figure was "so conservative it's ridiculous" because the county government "has grown three to four times" from when he started and that "it's growing every year" is not a sufficient basis to project increased income. This testimony is simply too speculative to support a jury verdict of $500,000.00. *See Morton v. Rogers, supra; see also, Rancho Pescado, Inc., supra.*

■ Appellees maintain that damages in defamation actions are "particularly within the discretion of the jury." *See Hansen v. Stoll*, 130 Ariz. 454, 636 P.2d 1236 (App.1981). As a general rule, this is a correct statement of the law. However, when lost profits are sought, rather than damage to one's reputation, the evidence must be more specific:

> The plaintiff who claims special damage in the form of lost profit is not always aided by the principle that allows him some imprecision in proving amounts. On the contrary, courts have often dismissed lost profits claims as speculative or conjectural even where there were some fairly definite bases for estimating the losses claimed.
>
> \* \* \* \* \* \*
>
> With the increase in willingness to award other kinds of special damage, courts have also shown an increased willingness to award lost profits, *subject always to the requirement that some rational ba-*

*sis for computation be furnished.* (emphasis added)

D. Dobbs, *Remedies* § 3.3 at 153–54 (1973).

We conclude that the jury's verdict of $500,000.00 in favor of Dombey, Inc. is not supported by the evidence. Accordingly, we must remand for a new trial as to damages to Dombey, Inc.

## CONCLUSION

The judgment and jury verdict of $100,000.00 in favor of appellees Dale Dombey and Billie Jo Dombey are affirmed. The judgment and jury verdict of $500,000.00 in favor of appellee Dombey, Inc. are reversed and remanded for a new trial as to damages only.

EUBANK, P.J., and JACOBSON, C.J., concur.

## APPENDIX A

### Insurer denies taking money from county

#### By BILL AHRENS

An associate of the agent-of-record for Maricopa County's $2.7 million employee health and life insurance program said Wednesday "not one dime has been taken" from the program by administrators.

"Do an audit and let's see if there is one penny missing." Don Jones told Maricopa County supervisors, who asked to meet with him concerning the program.

Sources said the deferred compensation plan is being investigated by the county attorney's office.

Supervisors also have paid Wyatt Corp. $30,000 to audit the plan.

The agent-of-record, Dale K. Dombey, did not attend the meeting because he recently suffered a heart attack.

Jones told supervisors he and Dombey had a net profit last year from the program of $34,927, which they split.

"If you question the ability of Dale and I to sustain our standard of living on this income, we assumed that you understood

that we had other clients," said Jones. "Dale has been in the business for over 15 years and I have been in over seven years. During this time we have established a substantial business in the private sector."

Jones said that in order to guarantee the continuity of the program, he spent 80 to 90 percent of his time working with Maricopa County.

"For the record I would like to say that as consultants we never touch the money for the deferred compensation program," he said.

A source said one supervisor is concerned that the audit by Wyatt Corp. may show some investment money was kept by the program administrators rather than returned to employees.

County Manager Charles Miller, who was placed on administrative leave Monday for 30 days without pay, is a member of the deferred compensation supervisory committee, as is Dombey. The committee has five members.

Miller was placed on leave for investment dealings that could be a conflict of interest.

Dombey, a longtime friend of Miller's has been agent-of-record for the county's employee health and life insurance since 1969.

Miller and Dombey were limited partners in several land investment deals.

Also Tuesday, supervisors approved reducing deductible amounts for county employees in the insurance program. Deductions were cut from $200 to $100 per calendar year per employee and from $400 to $200 per year per family. The change will cost an employee an additional $1.90 per month and the employee's family portion would be $2.87 more per month.

## APPENDIX B

### Supervisor upset over insurer's profit

#### By BILL AHRENS

Dale K. Dombey, who administers Maricopa County employees' insurance plan,

has made approximately $150,000 in commissions each year from one part of the program.

"That disturbs me," said Supervisor Fred Koory. "There is nothing illegal, but ..."

It was revealed this week to the supervisors that Dombey has received almost 50 percent in commissions on the $300,000 county employees annually placed in a deferred compensation savings plan.

The savings plan was discontinued last summer, but officials say hundreds of county employees still are in the plan and many lose money when they withdraw from it.

"I just can't conceive that the savings plan was brought in for a person's best interest," said Koory.

The deferred compensation plan also allows county employees to place money in a pooled fund at Valley National Bank or into a mutual fund program.

"Both of those plans are OK," said Koory. "They have been fully explained and Dombey gets only a 1 or 2 percent commission. It's the other plan that has spurred complaints."

One example is a county employee who began paying money into a savings plan more than two years ago. When he withdraws at the end of this year, he will lose more than $400.

The employee, who asked not to be named, joined a savings plan Jan. 1, 1977, and has $50 taken out of his paycheck each month.

After three years, he will have placed $1,800 in the plan, but will only be able to get back $1,377. Under the terms of the plan, he would have to wait nine years before he could withdraw 100 percent of his savings.

"The average person doesn't check it out because you think it's just another savings plan," he said.

Under the terms of his plan, he cannot withdraw from it until Jan. 1, 1986.

"The only good thing about the plan is that while it's in savings, the money is not taxable," he said.

The employee said one way to withdraw from the plan is to claim financial hardship, "but most people are not willing to do that while working for the county. And besides, nowhere in the policy does it outline what financial hardship is."

If the employee decided to stay in the program until he retired in the year 2005, he would have had almost $25,000 deducted.

He then would receive $176 a month until death.

"In the beginning when I joined the plan, I didn't think about ever getting out because I was just getting in," he said. "It's so simple to get in and they get your money before you feel it."

"It's a lousy program," said Supervisor George Campbell. "I don't know why we ever had it in the first place."

The county attorney's office is investigating the savings portion of the deferred compensation plan.

## APPENDIX C

### County-insurance report says agents made bundle

#### By BILL AHRENS

Maricopa County supervisors have received a confidential report that says some deferred compensation plans caused county employees to lose money but paid high commissions to agents.

The report urged that one of the writing agents, Dale K. Dombey, be removed from the enrollment process of the county's deferred compensation plan.

Supervisors paid Wyatt Co. $30,000 for the independent audit of county employee benefits; the report was received Friday.

"The report bears out what I've been saying," said Supervisor Fred Koory. "Some people that were putting their money onto various plans weren't getting the most for their money. And these plans were paying the most commissions to an agent."

Supervisor George Campbell said Dombey, who controls the county's $2.7 million employee health- and life-insurance program, was a "double agent."

"He was soliciting employees and also was the agent of record," said Campbell. "That's a conflict of interest."

The report recommended that in the future a county employee explain the deferred compensation plan to prospective participants and enroll them in the plan.

The report also stated that "a high percentage" of county employees enrolled in the plan do not understand their policies.

Koory and Campbell have questioned Dombey and his associate, Don Jones, about one of the plans—the Silver Star Annuity Policy. It was discontinued last summer, but some county employees still have money deducted for the plan.

It recently was revealed that Dombey could have made as much as 37½ percent commission on each Silver Star policy sold.

"The policy was discontinued after we (supervisors) started sniffing around," said Campbell. "It just wasn't in the best interest of the employees."

Under the plan, an employee has a minimum of $50 deducted from his check each month. The deductions are sheltered from taxes, but the employees must stay in the plan at least 9 years to get back 100 percent of his investment. Numerous employees who withdrew from the plan lost money.

Koory and Campbell have said Dombey could have made more than $100,000 a year on the plan, which was initiated in 1972.

But Jones claims less than $200,000 in commissions was made on it through 1978 and Dombey's share was only $59,464, according to records kept by Dombey Inc. Jones was not associated with Dombey until after the plan was discontinued and replaced by another plan.

The report recommended a new handout be prepared to explain the deferred compensation plan and its options.

"The present brochure is misleading and incomplete," the report stated. "We feel this new brochure is the key to the county handling the program."

The Maricopa County attorney's office began investigating all county insurance programs last fall.