724 P.2d 562

**Dale K. DOMBEY, and Billie Jo Dombey, his wife; and Dombey, Inc., an Arizona corporation, Plaintiffs-Appellees,**

v.

**PHOENIX NEWSPAPERS, INC., an Arizona corporation; and Bill Ahrens, Defendants-Appellants.**

No. 18122–PR.

Supreme Court of Arizona.

July 31, 1986.

Reconsideration Denied Sept. 23, 1986.

Marton & Hall, P.A. by Kraig J. Marton, and Andrews, Marenda & Moseley, P.A. by William S. Andrews, and Goodson & Allen, Ltd. by John F. Goodson, Phoenix, for plaintiffs-appellees.

Gust, Rosenfeld, Divelbess & Henderson by James F. Henderson, Jeffrey A. Ekbom, Phoenix, for defendants-appellants.

FELDMAN, Justice.

This case arises from a series of allegedly defamatory newspaper articles in *The Arizona Republic,* a newspaper published by Phoenix Newspapers, Inc. (defendants). The articles asserted, *inter alia,* that plaintiff Dale Dombey (Dombey) had engaged in various improprieties while acting as the insurance agent of record for Maricopa County. At trial, the jury found the statements to be false and defamatory. The court of appeals affirmed Dombey's judgment but ordered a new trial on the issue of damages for his company, Dombey, Inc. *Dombey v. Phoenix Newspapers, Inc.,* 147 Ariz. 61, 708 P.2d 742 (App.1985). Because of important first amendment questions, we granted review on some of the issues. Rule 23, Ariz.R.Civ.App.P., 17A A.R.S. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

## ISSUES

The trial judge ruled that Dombey was a private figure and that he might, therefore, recover compensatory damages upon a showing of negligence, while presumed and punitive damages could be recovered only upon a showing of actual malice. Concluding that the evidence was insufficient to support a claim of actual malice, the trial judge instructed the jury on negligence but not on punitive damages. The jury awarded compensatory damages, thus finding that the publications were false and defamatory and that defendant newspaper and defendant reporter had been at least negligent in publishing the articles.

Defendants claim that the court erred in its private figure ruling. They argue that Dombey was either a public official or a public figure, and the jury should have been instructed, therefore, that no recovery was allowed absent a showing of actual malice. Dombey maintains that he was a private figure and thus no error was committed when the compensatory damage issue was submitted to the jury on a negligence standard. In addition, Dombey claims that the private figure argument has been waived and should not be considered by this court.

## FACTS

In 1964 the Maricopa County Board of Supervisors appointed Dombey the county's insurance agent of record for health and life insurance. In that capacity, Dombey implemented and serviced life and health insurance programs covering county employees. When Dombey was first appointed, county employees had no group insurance. He lobbied for such programs and, after a plan was instituted, continued to push for improvements. As "agent of record" he was not a county employee and was not paid by the county. Instead, compensation was received in the form of commissions paid directly by the insurance carriers. The agent of record served at the will of the Board of Supervisors; Dombey held the position from 1964 until he resigned in August, 1979, subsequent to publication of the articles. He testified that he had worked hard to obtain and retain his position as agent of record. Periodically he fended off attempts by others who wanted

the job for the commissions it generated. Indeed, between 1970 and 1978 Dombey or his companies received over $228,000 in gross commissions from health and life insurance alone, the bulk of it after 1976.

The Board of Supervisors had final legal authority over insurance and voted to accept or reject plans proposed by Dombey or the insurance committee. Regardless of which plan was accepted, Dombey would receive a commission. However, testimony of Board members indicated that they relied on their "experts", and rarely undertook any independent investigation. The Board's primary concerns were budgetary. When it rejected a proposal Dombey had made, it was usually because an increased expenditure of county funds was required. By 1978, the county budgeted and spent $2.7 million annually for its share of premiums on employee life and health insurance plans, generating annual gross commissions to Dombey or Dombey, Inc. in excess of $55,000.

In 1973, Dombey proposed that deferred compensation plans as well as health and life insurance should be offered to county employees. The Board of Supervisors ultimately adopted his proposal because it benefitted the county's employees and cost the county nothing, as all contributions came from the employees themselves. The plans underwent a number of changes and modifications over the years as various options were added or removed. Dombey was appointed to an unpaid position on a five-member Deferred Compensation Committee and was made the plan administrator; this entitled him to a commission on all plan contributions made by employees.

Dombey was committed to enhancing the various options for the deferred compensation plan and worked hard to develop and maintain a good program. In order to prevent improprieties, he also did his best to insulate himself and his employees from actual contact with the money. Thus, all funds contributed by employees were paid directly to the banks or insurance companies offering the plans, which then paid Dombey his commissions. There were three basic types of plans: a savings plan with Valley National Bank; a mutual fund with Manequities; and a series of annuities and a combination life insurance/investment vehicle with ITAC, a subsidiary of a major insurance company. These plans all paid different commissions. From 1973 to 1978 Dombey, Inc. earned $59,464 in gross commissions from deferred compensation, the bulk of it from the ITAC plans.

Dombey used various corporate structures in his business. He first incorporated in the early 1970's as R.W. Grange, Limited. All the county commissions were paid to that company, of which Dombey was an employee. He also maintained a substantial private insurance business, although he spent a significant portion of his time doing county work. Fees from private customers also were paid to the corporation. Dombey later became associated with Wesley Arnold, selling him fifty percent of the stock in R.W. Grange. Shortly thereafter, Dombey had a heart attack and Arnold purchased the remaining shares of the corporation from Dombey with payments spread over ten years.

Dombey left, but he took his county business with him. He then established Dombey, Inc., which received all his county commissions. Dombey remained agent of record, and the Board of Supervisors dealt with him personally. In October, 1977 Dombey hired Donald Jones as a salesman, intending to train him and ultimately bring him into the business. The following month, Dombey suffered another major heart attack. He sold Dombey, Inc. to Jones, placing the stock in escrow until Jones performed on a buy-out agreement which entitled Dombey to receive diminishing percentages of the corporation's income over a ten-year period. While Dale Dombey no longer worked full-time after Jones took over the business, he did provide occasional consultations concerning the management of Dombey, Inc., proffered advice on specific insurance problems and referred clients. Dombey's name remained on the letterhead, he remained agent of record for Maricopa County life and health

insurance, and he was still plan administrator for the county's deferred compensation program.

Dombey also made arrangements with Jones and Arnold to receive a portion of any commissions generated by referrals from private customers. Dombey presently owns all the stock in Dombey, Inc.; county income ceased after he resigned as agent of record and, in effect, Jones returned the business to him.

The eighteen articles upon which Dombey brought suit were published in *The Arizona Republic* [1] in March and April of 1979. Initially, the articles concerned conflict of interest allegations against then County Manager Charles Miller. Dombey was first named as an investment partner and longtime friend of Miller's, as well as the man in "control" of Maricopa County's life and health insurance programs. Subsequent articles implied that Dombey had made excessive commissions from the various programs he administered, that he had "kept" employees' investment funds and that he was under investigation by a grand jury. At trial these allegations were found to be false and defamatory, and the record clearly supports that finding.

The articles had their inception in the confusion surrounding the county insurance business prior to the time of publication. Apparently there was an ongoing grand jury investigation into fraud in the county casualty insurance program, which was administered by a different agent of record and was completely unrelated to Dombey's activities. At the same time, County Manager Miller came under investigation for alleged improprieties. While reading county records, a reporter for the *Republic*, Mr. Seper, noticed that Miller, Dombey and a county employee were all limited partners in several limited partnerships. Seper telephoned the various parties involved, including Dombey, and conducted an investigation which resulted in the publication of the March 11, 1979 article about potential conflicts of interest. At about this same time, the Board of Supervisors asked the county attorney to investigate Miller. It is unclear whether this investigation was begun before or after the articles were written. In any event, the county attorney later reported that there was no evidence of illegality. The Board of Supervisors also hired the Wyatt Company to study the county insurance plans. Aspects of its report were misreported in the newspapers.

Dombey presented the newspaper with an extensive demand for correction and retraction. The newspaper claimed to have printed an adequate retraction, but the jury found that it had not. Additional articles were published and ultimately three more retraction demands were presented to the newspaper.

Ultimately, Dombey and Dombey, Inc. filed this libel action. The trial court granted plaintiffs' motion for partial summary judgment to strike first amendment defenses and the case was tried on a negligence standard. The jury awarded Dombey $100,000 and Dombey, Inc. $500,000. Defendants' motion for judgment n.o.v. based on Dombey's public status was denied. The court of appeals affirmed the award to Dombey, holding that he was not a public official. (147 Ariz. at 64, 708 P.2d 745.) It reversed the judgment granted to Dombey, Inc. because damages were too speculative and ordered a new trial on that issue. (147 Ariz. at 67, 708 P.2d at 748.) We granted review on the issue of whether Dombey was a public figure or public official and the impact, if any, of Dombey's status on the other plaintiffs. We subsequently ordered supplemental briefs on the issues of waiver and public figure status.

## THE PRESENT STATUS OF THE LAW OF LIBEL

Historically, the common law has supported Shakespeare's view of the importance of reputation. "Who steals my purse

---

**1.** A few articles, also alleged to be defamatory and written by a different reporter, were published in *The Phoenix Gazette,* another newspaper published by defendants. Those articles are not relevant to the issues discussed in this opinion.

steals trash; ... but he that filches my good name robs me of that which not enriches him, and makes me poor indeed." *Othello*, Act III, scene iii. The common law of defamation has reflected "no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966). Nevertheless, the last twenty years have wrought great changes in the law of defamation.

The common law imposed an early form of strict liability, holding the publisher liable without fault for publication of statements that were false and defamatory. *See generally* Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer*, 61 VA.L.REV. 1349, 1352–57 (1975). Presuming that plaintiff's reputation was good and that defamatory statements were false, the common law permitted the plaintiff to recover presumed damages without proof of actual loss and required the publisher to carry the burden of proving the defense of truth. *See Philadelphia Newspapers, Inc. v. Hepps*, —— U.S. ——, 106 S.Ct. 1558, 1561, 89 L.Ed.2d 783 (1986).

Arizona followed these common law principles. *See, e.g., Broking v. Phoenix Newspapers, Inc.*, 76 Ariz. 334, 264 P.2d 413 (1953); *Central Arizona Light & Power Co. v. Akers*, 45 Ariz. 526, 46 P.2d 126 (1935). Of course, the common law also recognized a number of privileges, in some cases allowing recovery only upon a showing of "malice in fact." *Broking*, 76 Ariz. at 338, 264 P.2d at 416; *Green Acres Trust v. London*, 141 Ariz. 609, 688 P.2d 617 (1984). The common law considered malice in fact as a species of ill will or spite. *Selby v. Savard*, 134 Ariz. 222, 228, 655 P.2d 342, 348 (1982); A.R.S. § 12–653.-01(1).[2]

Defamation obtained constitutional protection in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686

(1964). *New York Times* held that public officials seeking damages from media defendants for publications of defamatory material on matters of public concern could only recover on clear and convincing evidence of "actual malice." 376 U.S. at 280, 84 S.Ct. at 726. In *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Court struggled with the concept of "public official", found no rational distinction between it and private citizens who "seek to lead" in the determination of policy and extended constitutional doctrine to encompass public figures as well as public officials. 388 U.S. at 148–51, 87 S.Ct. at 1987–89.

The expansion of constitutional protection and concomitant contraction of the common law action for defamation reached its zenith in *Rosenbloom v. Metro Media, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). A plurality of the Court there held that the actual malice standard applied whenever a publication concerned matters of public interest. *Rosenbloom* shifted the focus from the plaintiff's identity to the content of the publication. *See* Comment, *Gertz and the Public Figure Doctrine Revisited*, 54 TUL.L.REV. 1053, 1064–65 (1980). This content-based approach was rejected in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). *Gertz* returned the focus to the identity of the plaintiff and formulated a two-prong test for determining public figure status—the trigger, along with public official status, for the actual malice requirement.

In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

**2.** The statute has not been raised or argued on appeal and is not considered in this opinion.

418 U.S. at 351, 94 S.Ct. at 3013. *Gertz* held, further, that in media cases which involve neither a public official nor a public figure the states were free to fashion their own remedies, but could not impose liability without some species of fault. Neither presumed nor punitive damages could be awarded absent clear and convincing evidence of actual malice. *Id.* at 349–50, 94 S.Ct. at 3011–12.

That part of the *Gertz* test involving public figures who have been "drawn into a particular public controversy" would be particularly appropriate for the facts of the case at bench. However, aside from its articulation in *Gertz,* it has never been applied by the Supreme Court and may have been abandoned. Note, *The Involuntary Public Figure Class of Gertz v. Welch: Dead or Merely Dormant?* 14 U.MICH.J.L.REF. 71, 79–85 (1980); *but see Meeropol v. Nizer,* 560 F.2d 1061 (2d Cir. 1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978), and *Dameron v. Washington Magazine, Inc.,* 779 F.2d 736 (D.C.Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986). Accordingly, we do not rely on that doctrine for our resolution of this case.

*Gertz* was followed by *Dun and Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. —, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), in which a plurality of the Court concluded that *Gertz'* requirement that a plaintiff show actual malice for recovery of presumed or punitive damages was inapplicable where the plaintiff was a private figure and the publication involved only matters of private concern. That conclusion is reinforced by the Court's most recent decision, *Philadelphia Newspapers, Inc. v. Hepps, supra,* involving a private-figure plaintiff seeking damages from a media defendant for publication of a matter of public concern. *Hepps* held that in cases involving matters of public concern the common law presumption of falsity must give way to first amendment interests and that, therefore, the common law allocation of burden of proof would be reversed; instead of the defendant having the burden to prove truth, the plaintiff would have the burden of proving falsity. *Hepps,* — U.S. at —, 106 S.Ct. at 1564.

These decisions establish that when a plaintiff is a private figure and the speech is of private concern, the states are free to retain common law principles. The case at bench does not fit into this scenario; the speech here involves the quality of the conduct of county government, including charges of cronyism and conflicts of interest involving governmental programs. Such speech is at the very core of "public concern" and is protected by the first amendment. *Philadelphia Newspapers v. Hepps,* — U.S. at —, 106 S.Ct. at 1564; *McDowell v. Paiewonsky,* 769 F.2d 942 (3rd Cir.1985).

Because the speech in question involves matters of public concern, the decisions of the United States Supreme Court cited above lead us to the conclusion that if Dombey is either a public official or a public figure he may not recover any damages from the newspapers absent a showing of actual malice as that phrase is used in *New York Times v. Sullivan* and its progeny. If, on the other hand, Dombey is a private figure, he may recover actual damages on a lesser showing. In this connection, we have previously held that the "lesser showing" permitted by *Gertz* in private figure/public concern cases will be satisfied if the plaintiff establishes that the media defendant was negligent in publishing the defamatory falsehood. *Peagler v. Phoenix Newspapers, Inc.,* 114 Ariz. 309, 315, 560 P.2d 1216, 1222 (1977). Such a showing will suffice for recovery of compensatory damages, but not for either presumed or punitive damages. *Id.* at 316, 560 P.2d at 1223. Thus, if Dombey is a private figure, the trial court was correct in submitting the case on a negligence standard.

## WAIVER

Dombey claims that the defendants cannot raise the public figure doctrine recognized by *Curtis Publishing Co. v. Butts, supra,* having failed to argue it in the

court of appeals. It is true that the defendants neither mentioned the term "public figure" nor argued the *Butts* doctrine in the briefs filed in the court of appeals. Nor was the issue raised in defendants' Petition for Review to this court. It was raised *sua sponte* in our request for supplemental briefs. Dombey contends that the issue was waived and that it is inappropriate for this court to raise issues not argued by the parties.

Two related doctrines are implicated in the position Dombey urges. The first is "that as a general proposition an appellate court will not consider a question not first raised" in the trial court. *Town of South Tucson v. Board of Supervisors of Pima County*, 52 Ariz. 575, 582, 84 P.2d 581, 584 (1938); *see also Van Loan v. Van Loan*, 116 Ariz. 272, 274, 569 P.2d 214, 216 (1977); *Milam v. Milam*, 101 Ariz. 323, 325, 419 P.2d 502, 504 (1966). This rule, of course, serves objectives of fair notice, and promotes both the ability to meet issues and judicial efficiency.

In the case at bench, these considerations do not have great force because the public figure issue was raised and fully argued in the trial court. Both public official and public figure defenses were raised in the answer and in the summary judgment motion which resulted in the private figure ruling. After trial defendants again raised both public figure and public official contentions in their motions for a new trial and judgment n.o.v.

Nevertheless, this court generally is reluctant to consider issues raised in the trial court but not argued before the court of appeals. In these situations, the question is not one of an opponent's ability to meet factual issues, but flows from our concerns about comity between courts and the promotion of judicial efficiency. A waiver by failure to raise an issue in the court of appeals should be even more readily found when the party seeking review has also failed to raise the issue in his petition. Ordinarily, we would not consider an issue so neglected.

However, this rule is procedural, not substantive, and may be suspended in our discretion. *Town of South Tucson v. Board of Supervisors*, 52 Ariz. at 582, 84 P.2d at 584. Instances in which we exercise this discretion include issues of statewide importance, those of constitutional dimension or situations in which the public interest is better served by having the issue considered rather than deferred. *Barrio v. San Manuel Division Hospital*, 143 Ariz. 101, 104, 692 P.2d 280, 283 (1984); *Ruth v. Industrial Commission*, 107 Ariz. 572, 573–74, 490 P.2d 828, 829–30 (1971). This is clearly such a case, both for the reasons mentioned and because we have substantial doubt whether the Constitution would permit us to avoid consideration of first amendment issues even if we were so disposed. The United States Supreme Court has consistently held that appellate courts must engage in independent review of "constitutional facts" in order to safeguard first amendment protections. *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1958–59, 80 L.Ed.2d 502 (1984). The same sort of waiver claim was argued by the plaintiff in *Curtis Publishing v. Butts*. In rejecting the argument, the Court stated:

> ... the constitutional protection which [plaintiff] contends that [defendant] has waived safeguards a freedom which is the 'matrix, the indispensible condition, of nearly every other form of freedom.' [citation omitted] Where the ultimate effect of sustaining a claim of waiver might be an imposition on that valued freedom, we are unwilling to find waiver in circumstances which fall short of being clear and compelling.

*Butts*, 388 U.S. at 145, 87 S.Ct. at 1986.

Plaintiffs understandably believe it best that the court remain a neutral observer, refraining from raising issues which the parties have failed to raise. Accepting the virtue of this view for most cases, we do not believe that it can be applied here. We believe that the Constitution tips the scales in favor of free speech and compels this court to consider all issues, both factual

and legal, which bear upon the constitutional privileges accorded by the first amendment and article 2, § 6 of the Arizona Constitution, unless the issues have been intentionally and clearly waived by the parties. Only in this manner can we "confine [unprotected speech] within acceptably narrow limits in an effort to insure that protected expression will not be inhibited." *Bose*, 466 U.S. at 505, 104 S.Ct. at 1962. Thus, we hold there has been no waiver of the public figure issue.

## WAS DOMBEY A PUBLIC FIGURE?

We begin our inquiry fully aware that defining a public figure "is much like trying to nail a jellyfish to the wall." *Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440, 443 (S.D.Ga.1976), *aff'd*, 580 F.2d 859 (5th Cir.1978). We have previously noted that public figures may reach that status because of their position, their "purposeful activity" in "thrusting" themselves into matters of public controversy or their close involvement with the resolution of matters of public concern. *Antwerp Diamond Exchange of America, Inc. v. Better Business Bureau of Maricopa County, Inc.*, 130 Ariz. 523, 527, 637 P.2d 733, 737 (1981), citing *Curtis Publishing Co. v. Butts, supra.*

Dombey claims that none of these categories fits the facts of this case. He contends that one does not lost private figure status merely because he transacts a limited type of business with a government agency; a contrary rule would make everyone who provides the government with goods or services fair game for the media. While we agree with the argument, we do not believe the facts support it in this case.

■ We examine those facts in light of the appropriate legal standards. An individual may become a public figure if he "thrust[s] himself or his views into public controversy to influence others." *Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979). Under this test, Dombey would not be a public figure. He did not insert himself or his views into any public controversy;

there was no controversy until the newspaper articles brought the matters to public attention. Even then, Dombey sought to avoid publicity rather than to obtain it. The media cannot create a public figure defense by raising an issue and naming the plaintiff. *Wolston v. Reader's Digest Ass'n., Inc.*, 443 U.S. 157, 167–68, 99 S.Ct. 2701, 2708, 61 L.Ed.2d 450 (1979).

Another factor often considered in determining public figure status is whether the individual's position with respect to matters of public concern gives him access to the media on a regular and continuing basis. *Hutchinson v. Proxmire*, 443 U.S. at 135, 99 S.Ct. at 2688. Those who have such access possess the means to preserve their reputations by rebutting the charges made against them. Dombey argues, and we agree, that this factor is factually inapplicable to him.

■ Defendants argue that the subjects covered by the articles were matters of public concern and were legitimate topics of public debate. They contend that since Dombey's name arose in connection with the subject he assumed the status of a public figure. The facts do fit this view, but we believe the legal formulation to be incorrect. Here, as in *Wolston* (a case dealing with a nephew of a couple who years before had been convicted as Soviet agents), the subject was "newsworthy." However,

> ... the simple fact that these events attracted media attention also is not conclusive of the public-figure issue. A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. To accept such reasoning would in effect re-establish the doctrine advanced by the plurality opinion in *Rosenbloom v. Metro Media, Inc.* ....

*Wolston v. Reader's Digest Ass'n., Inc.*, 443 U.S. at 167, 99 S.Ct. at 2707. The Court indicates rather clearly in *Wolston* that those drawn into public debate or controversy "largely against their will" in or-

der to meet charges leveled against them in the media or to respond to actions brought against them, are not public figures. *Id.* at 168–69, 99 S.Ct. at 2708, *citing Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). *See also Gannett Co., Inc. v. Re,* 496 A.2d 553 (Del.1985). Thus, the cases indicate that doing business with the government, being swept up in a controversy over an issue of public interest or concern, being named in articles creating a public controversy, and defending oneself against charges leveled in the media are all insufficient to automatically transform a private individual into a public figure.

This brings us back to *Hutchinson v. Proxmire, supra,* the case on which Dombey primarily relies. In that case, Hutchinson, a researcher for the Navy Department, NASA and others, had applied for and received research grants from the government. The work was done under contract but Hutchinson's employer was a university rather than the government. The government agencies which funded the research were given Senator Proxmire's "Golden Fleece Award," an honor accorded those agencies which the Senator considered outstanding in their waste of governmental money. The award was made for Hutchinson's project, which involved research upon the behavior patterns of monkeys exposed to stressful stimuli. 443 U.S. at 114–15, 99 S.Ct. at 2678. In holding that Hutchinson was a private figure, the court noted that he

> ... at no time assumed any role of public prominence in the broad question of concern about expenditures. Neither his applications for federal grants nor his publications in professional journals can be said to have *invited that degree of public attention and comment* on his receipt of federal grants essential to meet the public figure level. The petitioner in *Gertz v. Robert Welch, Inc.,* had published books and articles on legal issues; he had been active in local community affairs. Nevertheless, the Court concluded that his activities did not make him a public figure.

*Id.* at 135–36, 99 S.Ct. at 2688 (emphasis supplied).

■ We believe the facts in the case at bench take it outside of the holding in *Hutchinson.* Unlike Hutchinson, Dombey did assume a role of public prominence with respect to a matter of public concern. Dombey sought, received, accepted and struggled to keep appointments as the designated insurance agent of record for a large county and administrator of deferred compensation programs for its employees. While he was not employed by and received no direct benefits from the public body, he did receive significant and valuable benefits because of his position. He did more than compile and transmit research results or publish arcana in obscure learned journals; he made recommendations resulting in substantial expenditures from the public fisc for health and life insurance programs and of private funds obtained by payroll deductions from public employees for the deferred compensation program.

By assuming the position that he held, Dombey invited public scrutiny and should have expected that the manner in which he performed his duties would be a legitimate matter of public concern, exposing him to public and media attention. This is not to say that every provider of goods and services to the government becomes a public figure. *See Hutchinson,* 443 U.S. at 135, 99 S.Ct. at 2688. We believe that no bright line can be drawn. A person who sells legal pads to the judicial department may legitimately expect to retain almost complete anonymity. Those responsible for providing rockets for the space program may not legitimately enjoy the same expectations. Dombey is at neither pole, but we believe that by assuming the positions of agent of record and administrator for the deferred compensation plans, he surrendered any legitimate expectation of anonymity with regard to the manner in which he performed in his positions, his relationship with executives of the governmental agencies and the other matters with which the articles were concerned.

Substantial case law supports this analysis. In *McDowell v. Paiewonsky*, 769 F.2d 942 (3rd Cir.1985), an architect for a government-built project brought a libel action against a radio broadcaster, contending that articles falsely accused him of conflict of interest, poor performance on public projects and the like. McDowell claimed he was not a public figure but only a "virtually unknown architect who occasionally worked on public building projects." 769 F.2d at 949. The court disagreed, noting that McDowell had not only chosen to engage in the profession of architecture but, by dealing with the government on a succession of large and expensive projects, had undertaken "a course of conduct" that invited attention and scrutiny. *Id.* McDowell was, therefore, a public figure even though he neither sought nor desired public attention. Whatever requirement there might be to "thrust" oneself into a public controversy was satisfied by his voluntary participation in activity calculated to lead to public scrutiny. *See also Dameron v. Washington Magazine, Inc.*, 779 F.2d 736 (D.C.Cir. 1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986) (air traffic controller was public figure with regard to public controversy over crash which occurred while he was on duty); *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219 (2d Cir.1985) (restaurant a public figure for purposes of restaurant review); *Fitzgerald v. Penthouse International*, 691 F.2d 666 (4th Cir.1982), *cert. denied*, 460 U.S. 1024, 105 S.Ct. 1277, 75 L.Ed.2d 497 (1983); *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3rd Cir.1979) (*en banc*) (professional football player is a public figure with respect to statements concerning his ability to play professional football); *Rosanova v. Playboy Enterprises, Inc., supra; Kaufman v. Fidelity Federal Savings & Loan Assn.*, 140 Cal.App.3d 913, 189 Cal.Rptr. 818 (1983) (bank president who sought to influence governmental officials in charge of zoning was a public figure).

We believe that Dombey, like McDowell, "can be considered to have voluntarily assumed a position that invited attention." *McDowell v. Paiewonsky*, 769 F.2d at 950. He had "assume[d] special prominence in the resolution of [a] public question." *Dameron*, 779 F.2d at 742, quoting *Gertz*, 418 U.S. at 351, 94 S.Ct. at 3012. Unlike McDowell, at the time Dombey accepted his position no public controversy yet existed with respect to the business in which he was engaged. However, we do not believe this distinction is determinative. *Dameron, supra.* Like McDowell, Dombey entered into a continuing relationship with the government and could be expected to receive the scrutiny that eventually attends upon all major governmental efforts. Dombey cannot complain that the spotlight eventually turned on him; its unwelcome glare was a matter of time, not surprise. We conclude, therefore, that Dombey was a limited purpose public figure as to the county insurance programs. Because the articles involved matters of public concern and pertained to the matters which made Dombey a limited purpose public figure, the actual malice standard of *New York Times v. Sullivan* was required. The trial court erred when it allowed the jury to decide the case on a negligence standard. The judgment entered on the jury verdict must be vacated.[3]

## REMAND, NEW TRIAL OR DISMISSAL?

### 1. *The Standard of Review.*

Must we remand for a new trial applying the actual malice standard or should we instruct that judgment be entered for defendants? Before we can make this determination, we must decide the scope of our review of the facts supporting the existence of actual malice. The standard has been posited as follows:

---

**3.** Because we hold that Dombey is a public figure, we need not reach the difficult issue of whether Dombey, a person who held no public office, nevertheless could possibly be characterized as a public official. See *Jenoff v. Hearst Corp.*, 644 F.2d 1004, 1006 (4th Cir.1981), for the view that one can be a public official without being on government payroll.

[A]s expositors of the Constitution, [courts] must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice". *Bose Corp. v. Consumers Union,* 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984). *Bose* was a review of a judgment entered after bench trial. In post-trial reviews of the sufficiency of evidence, the Court has considered actual malice as a mixed question of law and fact subject to independent appellate review, unlike pure factual questions, which belong to the factfinder. *Id.; Liberty Lobby, Inc. v. Anderson,* 746 F.2d 1563, 1569 (D.C.Cir.1984), *overruled on other grounds,* — U.S. —, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In performing an "independent appellate review" the appellate judge "must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity." *Bose Corp. v. Consumers Union,* 466 U.S. at 514, 104 S.Ct. at 1967. This level of review applies only to the "constitutional facts", not to the remainder of the evidence. *Id.,* 466 U.S. at 514 n. 31, 104 S.Ct. at 1967 n. 31.

Of course, review for sufficiency of the evidence after a factfinder has applied the actual malice standard differs from the situation we face in the case at bench, in which the judgment must be vacated because of legal error at trial and we must determine only whether to remand the case for a new trial or dismiss it. In effect, we are deciding whether the evidence is sufficient to warrant a new trial in which the actual malice standard must be met. We believe this is analogous to deciding whether, after all discovery is complete, the evidence is sufficient to allow the case to reach trial or, if it has reached trial, is

sufficient to take the issue of actual malice to the jury.[4] Thus, the issue presented is the same as would be presented on a motion for summary judgment or a motion for directed verdict. The standard which we should adopt in viewing the evidence in this situation has recently been announced by the Supreme Court.

Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

In sum, we conclude that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. This is true at both the directed verdict and summary judgment stages. Consequently, where the *New York Times* "clear and convincing" evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.

*Anderson v. Liberty Lobby, Inc.,* — U.S. —, —, 106 S.Ct. 2505, 2513–14 (citations and footnote omitted).

With this standard in mind,[5] we turn to the evidence in the case.

---

4. Despite the erroneous ruling applying a negligence standard to the question of recovery of compensatory damages, the parties did try the question of actual malice because plaintiff sought recovery of punitive damages, which the trial judge ruled could be recovered only on proof of actual malice. Thus the record before

us presumably contains all the evidence which plaintiff could then muster on that issue.

5. We note a contrary view taken in *Marcone v. Penthouse International Magazine for Men,* 754 F.2d 1072, 1088–90 (3rd Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 182, 88 L.Ed.2d 151

## 2. *The Substantive Standard.*

The actual malice standard is reached when there is clear and convincing evidence that defendant published either knowing that the article was false and defamatory or that it published with "reckless disregard of whether it was false or not." *New York Times v. Sullivan,* 376 U.S. at 279–86, 84 S.Ct. at 725–29. In the balance of this opinion we refer to both concepts whenever we use the term "actual malice." There being no direct evidence that defendants knew the articles were untrue, we need only determine whether there is sufficient evidence to satisfy the somewhat lower requirement of reckless disregard. The Court's subsequent definition of that phrase suggests that the label used in *New York Times* is incorrect. The disregard must be more than "reckless"—*conscious* disregard would be a better description of the test.

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published; or would have investigated before publishing. There must be *sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.* Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

It may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware · of its probable falsity. Concededly the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. ...

> But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones.

*St. Amant v. Thompson,* 390 U.S. 727, 731–32, 88 S.Ct. 1323, 1325–26, 20 L.Ed.2d 262 (1968) (emphasis supplied).

This standard has been elaborated somewhat by subsequent cases. One factor is defendant's failure to investigate after letters and demands; failure to investigate is not reckless disregard per se, *St. Amant, supra,* but it provides some evidence of actual malice when the facts confronting defendant are such that no reasonable person would fail to investigate. *Liberty Lobby, Inc. v. Anderson,* 746 F.2d at 1569. Further, "[a]bsent an admission by the defendant that he knew his material was false or that he doubted its truth, a public figure must rely on circumstantial evidence to prove his case." *Hunt v. Liberty Lobby,* 720 F.2d 631, 643 (11th Cir.1983), citing to *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

## 3. *The Substantive Legal Standard as Applied to the Evidence.*

Does the evidence support a finding that defendants published the articles with "reckless disregard" of their truth? The reporters and editors involved in the publications all testified that they believed the articles were true. Of course, these are interested parties and the jury may find

---

(1985). *Marcone* was decided before *Anderson v. Liberty Lobby, supra.* In any event, we disagree with its conclusion because it gives insufficient weight to the right to a jury trial. It is one thing to engage in a constitutionally mandated, independent review of the evidence to see if it supports a verdict which otherwise will stand; it is a different thing, having reversed the verdict for error of law, to determine whether the evidence is sufficient to permit the case to go to trial at all. While the difference may be subtle, the seventh amendment right to a jury trial in federal cases is implicated. That right is not applied to the states by the due process clause of the fourteenth amendment, *see* L. TRIBE, AMERICAN CONSTITUTIONAL LAW 568 (1978), but is guaranteed by article 2, § 24 of the Arizona Constitution. The analysis is the same. Our function is not to act as a second set of jurors but to determine whether the evidence is sufficient for the jury to consider. We believe *Anderson v. Liberty Lobby, supra,* is, therefore, the proper framework. Adopting that standard gives due regard for the jury's ultimate determination on matters of credibility. *Id.,* —— U.S. at ——, 106 S.Ct. at 2514.

their testimony not credible and disbelieve it. *Thomas v. Bowman*, 24 Ariz.App. 322, 324, 538 P.2d 409, 411 (1975); McCOR-MICK, EVIDENCE § 40 at 86 (3rd ed. 1984). We must leave that decision to them. *Anderson v. Liberty Lobby*, — U.S. at —, 106 S.Ct. at 2514; *St. Amant v. Thompson, supra.* However, even if the jury does discount defendants' affirmative avowals of probity, such "discredited testimony is not [alone] considered a sufficient basis for drawing a contrary conclusion." *Anderson*, — U.S. at —, 106 S.Ct. at 2514, 54 U.S.L.W. at 4760, quoting *Bose Corp. v. Consumers Union*, 466 U.S. at 512, 104 S.Ct. at 1966. *Anderson* requires that plaintiff present "significant probative evidence" which would support a finding that defendant published even though it entertained a subjective doubt of truth. *Anderson*, — U.S. at —, 106 S.Ct. at 2514, 54 U.S.L.W. at 4759.

We note, also, that we deal with a state of mind, something that is difficult to prove. *Id.; see also Bose Corp. v. Consumers Union*, 466 U.S. at 516–18, 104 S.Ct. at 1968–69 (Rehnquist, J., dissenting); *Anderson*, — U.S. at —, 106 S.Ct. at 2514–15 (Brennan, J., dissenting). Since there will seldom be direct evidence, the problem in most cases is to determine state of mind from indirect evidence, to draw, in other words, an inference. Inferences are for the finder of fact, unless only one inference may be drawn. *Mid-Century Insurance Company v. Duzykowski*, 131 Ariz. 428, 641 P.2d 1272 (1982). We must determine, then, whether there is sufficient evidence from which the jury might draw the requisite inferences and find the facts clearly and convincingly established. We believe the evidence meets this test.

It is true that the initial article resulted from a thorough investigation even though it contained some inaccuracies. However, Seper was transferred to a different beat, and a new reporter with little or no investigative experience was assigned to the county beat. Between March 13 and March 27, the new reporter wrote six articles detailing allegations and charges against Dombey without ever talking to Dombey or

Miller. Relying on Seper's investigation, conversations with members of the Board of Supervisors and statements made at public meetings, the reporter made no further record search. However, failure to investigate, sloppy investigation, poor reporting practice and the like are not per se actual malice; "inaccuracy ... is commonplace in the forum of robust debate to which the *New York Times* rule applies." *Bose Corp. v. Consumers Union*, 466 U.S. at 513, 104 S.Ct. at 1966; *Herbert v. Lando*, 441 U.S. 153, 171–72, 99 S.Ct. 1635, 1646 (1979).

From this point, however, the complexion of the case changes significantly. On March 27, County Manager Miller called the reporter to complain of inaccuracies in the prior articles. On March 28 a "retraction" was published, but it contained further false statements about Dombey. On March 28, Dombey's associate, Jones, made a presentation to the Board of Supervisors, detailing all of Dombey's life and health insurance accounts as the county's agent of record. The reporter was present at the meeting and received a copy of the documents and figures. On March 29, another article was published, reporting some of Jones' statements but making other inaccurate factual allegations. This was followed without further investigation on April 2 by an article which stated that Dombey had earned "$150,000 in commissions each year from the [deferred compensation] program." This allegation was false, contrary to the facts contained in the newspaper's own article of March 11 and contradicted by the figures that Jones had provided just two days earlier.

The tale does not end here. In response to the new allegations, Jones presented a second letter to the Board of Supervisors, rebutting the charges contained in the April 2 article and providing accurate figures showing that from 1974 to 1978 Dombey had realized only $60,000 in gross commissions from the deferred compensation program. Of course, a $60,000 commission for four years' work looks much less like an impropriety attributable to cronyism

than is $150,000 per year. Other inaccuracies in the article were rebutted. Copies of this letter were sent to all media outlets in Phoenix, including the defendants.

On April 5, Jones also met with the reporter in order to present Dombey's side of the dispute. On April 8, an article was published, reciting *Jones' denial* of the reports in the previous articles, but this was followed on April 10 by another article, written by Seper, who had been temporarily reassigned to the county beat. The article falsely stated that Dombey was "the county's $150,000 a year insurance agent," involved with possible conflicts of interest with Miller and under investigation for connections as a major campaign contributor to a former supervisor. At trial it was brought out that Seper had not read all of the previous articles in his own newspaper and was unaware of Jones' denials in the controversy over commissions. He had based his article on the newspaper's file, which contained the incorrect allegations published in previous articles but did not yet include the most recent stories containing Jones' denial.

On April 11, Dombey served his notice of demand for retraction. A massive document, three inches thick, detailing at great length each and every supposed factual error, it was supported by extensive exhibits including county land records, insurance records, forms, limited partnership agreements and letters. When asked if he had read it, the reporter stated:

A. I remember because I thought I'd have to read it.
Q. Did you read it?
A. I believe I did.

The managing editor, Mr. Early, testified that the demand for retraction was delivered to him, *but he never read it.* He made copies, sent one to the reporters and one to his attorneys. Normally an investigation is conducted and if the newspaper is wrong a retraction is printed. Early admits that apparently this was not done, or at least there were no records of it having been done.

On April 16 Dombey made a second detailed demand and served it on the defendants. He received no response. On April 21 *another* article was published, "County Insurance Report Says Agents Made Bundle." The article misstated facts in the report, which showed that Dombey had not "kept" any commissions. The report recommended employment of a risk manager system but was described in the newspaper as calling for the removal of Dale Dombey. Actually, Dombey was not mentioned at all in the report.

In summary, while the first articles in the series were based on investigation, as the articles continued only minimal or no investigation was undertaken because the reporter relied almost exclusively on the prior articles and information obtained from the Board of Supervisors and public meetings. Assuming this is bad journalism, it still would not establish reckless disregard of truth. Actual malice is subjective and not based on journalistic standards or their breach. *St. Amant v. Thompson*, 390 U.S. at 731–32, 88 S.Ct. at 1335–36. Nor is failure to investigate a clear indication of actual malice. *Id.* However, once Jones made his detailed presentation to the Board of Supervisors on March 28, the defendants were on notice of particular facts in dispute. Defendants could have investigated those facts but did not; rather, defendants continued to publish further false allegations, refuted by facts in the newspaper's previous articles, Jones' statement and Dombey's retraction request.

General unspecific demands for retraction are, of course, of no weight. *Liberty Lobby v. Anderson*, 746 F.2d at 1569. However, detailed requests, citing specific inaccuracies and the facts to rebut them are a factor which, if ignored by the publisher, may indicate the presence of actual malice. *Id.* The request in the case at bench was described at trial as the most lengthy and detailed demand which the newspaper's employees had ever seen. Despite this, the articles continued with new charges and repetitions of the old charges on April 21. Dombey's further requests

for retractions went unheeded, and the last article was published without further investigation or any effort to check the factual sources, figures and leads provided in Dombey's retraction requests.

■ Applying the *St. Amant* standard to these facts, we are compelled to hold on the basis of "significant probative evidence" (*ante* at 574) that a reasonable jury could conclude that there was clear and convincing evidence that defendants published despite entertaining doubts as to the truth of the allegations against Dombey.

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a study is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. *Likewise, recklessness may be found where there are obvious reasons to doubt the veracity* of the informant or *the accuracy* of his reports.

*St. Amant v. Thompson,* 390 U.S. at 732, 88 S.Ct. at 1326 (emphasis supplied).

We are aware that the trial judge thought the evidence of actual malice insufficient to send to the jury. On the record, we believe he was wrong. In essence, this is a case in which the defendants had the correct information in their possession. The allegations in dispute were called to its attention several times. Nevertheless it continued to publish, without attempting verification of the detailed information provided it, thus repeating earlier factual inaccuracies even though it had been told they were untrue. We believe that these circumstances might impel the jury both to discredit defendants' protestations in its subjective belief and also to infer from objective evidence that defendants continued to publish, while entertaining doubts and thus in reckless disregard of truth.

We believe this is a "look them in the eyes" case. If the reporter and the editor are to be believed, one may find only carelessness, negligence and bad journalism. One jury has decided at least that much. If the reporter and editor are not believed, the evidence would support a finding of actual malice, with "convincing clarity." *Anderson v. Liberty Lobby, Inc., supra,* — U.S. at —, 106 S.Ct. at 2514–15.

This conclusion is not based on the simple possibility of "discredited testimony." There are significant, objective and largely uncontradicted facts which not only might warrant disbelief of defendants' witnesses but permit the finder of fact to draw an inference supported by "concrete evidence." *Id.* "Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences are jury functions." *Id.* To those who might fear that this offers only a slender reed to support first amendment protections, we have two answers. First, these same principles suffice for decisions on even more serious questions—literally life or death. Second, the constitutional guarantee of trial by jury (the seventh amendment for trials in federal court and art. 2, § 24 of the Arizona Constitution for the case before us) demands no less. *See, e.g., Armster v. United States District Court,* 792 F.2d 1423 (9th Cir.1986).

Therefore, we remand for a new trial.

### DOMBEY, INC.

■ The court of appeals remanded for a new trial on damages as to Dombey, Inc., finding that the evidence of lost profits was too speculative, indefinite and unsupported by the evidence. 792 F.2d at 1429–31. We did not accept review of that holding. The articles in question contained false allegations about Dale Dombey, not Dombey, Inc. May Dombey, Inc. maintain a defamation action based on libel of Dale Dombey? We

must address that question in light of the proof requirements.

One who publishes defamatory matter concerning a corporation is subject to liability to it

(a) if the corporation is one for profit, and the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it, ...

\* \* \* \* \* \*

b. A corporation for profit has a business reputation and may therefore be defamed in this respect. Thus a corporation may maintain an action for defamatory words that discredit it and tend to cause loss to it in the conduct of its business, without proof of special harm resulting to it. ... *A corporation is not defamed by communications defamatory of its officers, agents or stockholders unless they also reflect discredit upon the method by which the corporation conducts its business.*

Restatement (Second) of Torts § 561 and comment b (emphasis supplied). This rule has been interpreted to mean that libel of a corporation will support an action by an owner-shareholder if reasonable readers would understand it to charge the individual with the same conduct as the corporation. *Brayton v. Crowell-Collier Publishing Co.*, 205 F.2d 644, 645 (2d Cir.1953). We also have reached a similar conclusion and have stated that "a reader of the article would understand that it referred to [plaintiff] individually as well as to the corporation" and thus the individual was libeled as well. *Peagler v. Phoenix Newspapers, Inc.*, 114 Ariz. 309, 315, 560 P.2d 1216, 1222 (1977). We believe the converse is also true. Libel of an individual can cause injury to a corporation if they are so interconnected that a reasonable person would perceive harm to one as harm to the other.

■ The testimony at trial indicated that Dombey and his immediate family are the only Dombeys in Arizona. Dombey, Inc. was named in an article which referred to Dombey, Inc.'s records about commissions and indicated the relationship to Dale Dombey. Dale Dombey's name was on the letterhead and its business reputation and success were dependent upon Dombey's own. Thus, the allegations that Dale Dombey had acted improperly as an insurance agent reflected on the business practices of Dombey, Inc. as well. Therefore, there was sufficient evidence for the jury to find that Dombey, Inc. was also defamed. Because of this identity of interest and name, the same standard of proof also applies. Dombey, Inc. is also a public figure as to this public controversy and must prove the articles were published with actual malice, at least as to Dale Dombey. *Ante* at 571. *See geneally,* Fetzer, *The Corporate Defamation Plaintiff as a First Amendment "Public Figure": Nailing the Jellyfish,* 68 IOWA L.REV. 35, 73–84 (1982).

CONCLUSION

Dale Dombey is a limited purpose public figure. The articles in question were written about a public controversy in which he was embroiled. Therefore he must prove they were published with actual malice. Dombey, Inc. must do the same. The judgment of the trial court is reversed, the opinion of the court of appeals is approved in part and vacated in part. The case is remanded for a new trial and further proceedings consistent with this opinion.

GORDON, V.C.J., CAMERON, J., and MICHAEL A. LACAGNINA, Vice Chief Judge, and LLOYD FERNANDEZ, Judge, concur.

HOLOHAN, C.J., and HAYS, J., did not participate in this decision; pursuant to Ariz. Const. art. 6, § 3, MICHAEL A. LACAGNINA, Vice Chief Judge, and LLOYD FERNANDEZ, Judge, Court of Appeals, Division Two, were designated to sit in their stead.