768 P.2d 165

**WESTERN TECHNOLOGIES, INC., Plaintiff–Appellant,**

v.

**Pat NEAL and Betty June Neal, his wife, Defendants–Appellees.**

**No. 1 CA–CIV 9841.**

Court of Appeals of Arizona, Division 1, Department A.

Aug. 25, 1988.

Review Dismissed March 7, 1989.

**434**

Goldstein, Kingsley & Myres, Ltd. by Philip T. Goldstein, Pamela L. Kingsley, Phoenix, for plaintiff-appellant.

Ryley, Carlock & Applewhite, P.A. by Charles L. Chester, Susan M. Solomon, Phoenix, for defendants-appellees.

## OPINION

EUBANK, Judge.

Western Technologies, Inc. (Western) brings this appeal from summary judgment in favor of Pat Neal and his wife (Neal) in Western's action for defamation. To resolve the appeal we must decide the following issues: (1) what is the correct formulation of the test established by *Chamberlain v. Mathis*, 151 Ariz. 551, 729 P.2d 905 (1986) for qualified immunity of a public official; and (2) whether the trial court erred in its implicit determination that the materials presented to it raised no genuine issue of material fact on the qualified immunity issue, and that Neal was protected as a matter of law by qualified immunity when he allegedly defamed Western. We have jurisdiction pursuant to A.R.S. § 12–2101(B).

### Facts and Procedural History

In May 1983 the City of Scottsdale retained the architectural firm of Haver, Nunn and Collamer (HNC) to provide architectural and engineering services in planning and designing Scottsdale's corporation yard relocation project, to be located at 91st Street and Via Linda in north Scottsdale. As currently planned, the project will consist of a two-story office complex, a one-story warehouse and a one-story vehicle maintenance garage. It will contain approximately 93,770 square feet and house approximately 260 employees of the City of Scottsdale.

HNC retained Surface Engineering Company as the structural engineer for the project and contracted with Western for geotechnical engineering services and foundation design recommendations. Before Western performed a soils study at the project site, Surface Engineering told Western's geotechnical engineer, Ken Rick-

er, that the project would "consist of several one-story slab-on-grade buildings utilizing frame construction. The buildings will range in size from 2,000 square feet to 20,000 square feet. Maximum wall and column loads are assumed to be 5 to 8 klf, 60 to 80 kips respectively." [1]

Western issued its soils study report on November 4, 1983. The report stated in pertinent part as follows:

It is understood that the proposed complex will consist of several one-story slab-on-grade buildings utilizing frame construction. The buildings will range in size from 2,000 square feet to 20,000 square feet. Maximum wall and column loads are assumed to be 5 to 8 klf and 60 to 80 kips, respectively.

. . . .

Laboratory test results indicate that native subsoils at shallow foundation level exhibit relatively low compressability at natural moisture contents and a low to moderate tendency to compress additionally under an increased moisture condition. On-site near surface soils exhibit low expansive potential when compacted and saturated.

*Foundations:* Due to the anticipated variable foundation bearing levels. Shallow footings supported on undisturbed subsoil and/or compacted fill appear feasible for support. [Sic.]

Other methods of foundation support can be evaluated and recommendations presented if requested.

. . . .

Settlements for footings subjected to maximum assumed loading conditions and founded as recommended are estimated to be less than ½ inches. Additional total or differential settlements of less than ⅜ inches should occur should bearing soils become saturated. However, this is considered a remote possibility if proper site and surface drainage is provided.

. . . .

It is recommended that foundation excavations into undisturbed soils be inspected by the geotechnical engineer and deepened if loose or disturbed soils are encountered. If the soil conditions encountered are significantly different than those presented in this report, this firm should be contacted for verification and/or supplemental recommendations.

. . . .

Recommendations for slabs-on-grade and foundation elements supported on compacted fills or prepared subgrade are dependent upon satisfactory site preparation and placement and compaction of subsequent fill zones. Therefore, earth work relative to structural supports should be accomplished under observation and testing directed by the geotechnical engineer.

. . . .

*Drainage:* Positive drainage should be provided during construction and maintained throughout the life of the proposed development. Infiltration of water into utility or foundation excavations must be prevented during construction. Consideration should be given to the collection and diversion of roof runoff and to the elimination of planting areas and any other surface features which could retain water in areas adjoining the building.

. . . .

This report completes our present assignment for this project. As the design nears completion, we recommend that your office consult with us on unanticipated problems or questions regarding the design and/or the review of any plans or specifications.

Although Western's report assumed that the project would consist of several one-story slab-on-grade buildings utilizing frame construction, the building designed and actually constructed consisted of "30–foot high concrete tilt panels ... supported on isolated pedestal foundations." Construction of the project started in July of 1984.

1. A "kip" is a unit of weight equal to 1,000 pounds used to express deadweight load. "Klf" is kips per linear foot.

Griffiths Construction, Inc. was retained as the contractor on the project. Before the commencement of construction Western was never advised that the design of the project materially differed from that assumed in Western's soils study report. Western was never asked to examine the condition of Griffiths Construction's footing excavations to determine if the native soils were the same as those indicated in Western's soils study report.

Rainstorms occurred during construction, and Griffiths Construction permitted water to infiltrate the excavations for the footings and foundations of the project. On April 1, 1985 Griffiths Construction informed the City of Scottsdale that after the concrete tilt panels had been placed, settling occurred on approximately 90% of all the footings. This was evidenced by differential settlement of the wall panels and cracks in the soil adjacent to the foundation. The cost of repairing the settlement problem was estimated at $500,000 to $700,000.

Appellee Neal first worked for the City of Scottsdale as a surveyor from 1968 to 1971. He worked for the city as a public works inspector from 1971 to 1972, when he was promoted to supervisor of field engineering. In April of 1985 Neal was appointed design and construction services director for the city, and thereby assumed supervisory functions over the project. Neal thereafter also assumed the duties of inspection services director, and was assigned in April of 1985 to identify the cause of the settlement problem and determine a way to correct it.

When Neal commenced investigating the cause of the settlement at the project, he observed the job site and reviewed HNC's specifications for the job, Western's soils study report of November 4, 1983, and the City of Scottsdale's project folder. Neal also reviewed periodic reports by Scottsdale's special projects manager, Jerry Corbin, and reports prepared by Western; Jesse Wyatt; Robert Semmens; Sergent, Hauskins & Beckwith (SH & B); Robert Bowman; and Speedie & Associates. Neal additionally met and discussed the problem with various city employees and experts. Numerous reports and memoranda from April and early May of 1985 reviewed by Neal discussed, theorized and debated numerous possible causes of the settlement problem.

In addition, before July 10, 1985 Bob Crossley of SH & B told Jesse Wyatt, a structural and civil engineer engaged to help Neal identify the cause of the settling problem, that he and George Beckwith of that firm believed that in conducting its "plate load" tests, reported May 20, 1985, Western made a mathematical error in the calculation used to predict settlement, and that if the proper calculation had been used it would have more than doubled the predicted settlement of the soil. Wyatt so informed Neal before July 10, 1985. After Speedie & Associates' analysis report was completed, and before July 10, 1985, Wyatt told Neal that in his opinion the primary cause of the settling problem at the project was an error in Western's original soils analysis in recommending spread footings.

On at least two or three occasions between the date when settlement was first observed and July 10, 1985, Ken Ricker of Western was present at meetings on the site at which Neal was also present. When asked for his opinion about the cause of the settlement at the west end of the building, Ricker stated that a combination of factors had contributed, including: (1) the wetting of the soils; (2) the contractor's rapid loading of the footings; (3) the eccentric loading of the footings; and (4) the panels were heavier than the roof structure. Ricker also indicated that Western should have been asked to inspect the footing excavations before they were poured.

Part of Neal's job as design and construction services director for the City of Scottsdale was to speak to the media in his area of specialty unless he felt it was not in the best interests of the city to do so. Mark Flatten of the *Scottsdale Daily Progress* called Neal on or about July 10, 1985 and spoke to him about the project. Betsy Sandberg of the *Arizona Republic* called Neal on July 12 and 23, 1985 and also spoke to him about the project. When

Neal spoke to Flatten, Neal told him that the settlement problem was due to error in Western's soils analysis; that Western would have to pay for the repairs; that HNC designed the supports for the building after the soils analysis was done; and that because the ground was more unstable than the analysis stated, the 90 underground footings originally installed were not sufficient to support the 44 concrete wall panels placed on steel beams in April. The *Scottsdale Daily Progress* published an article on July 11, 1985 in which Neal's statements were quoted.

After Betsy Sandberg's first interview of Neal, the *Arizona Republic* published an article on July 13, 1985 which stated in part:

Pat Neal, inspection services director, said taxpayers will not have to pay a penny for repairs because the city is not responsible for the settlement in 44 of 90 exterior concrete support pads. Settling of a half-inch is considered normal.

Haver, Nunn and Collamer, the architects and primary consultants on the building, have accepted responsibility for repairs, according to Bob Mrozinski, architect for the project.

"It is a design-oriented problem, so it will become a design-oriented cost," he said.

Neal said the main cause of the settlement was an incorrect soils report, submitted by Western Technologies, Inc. of Phoenix.

Neal testified he had told Betsy Sandberg almost exactly what she printed in the story.

After Sandberg's second interview of Neal, the *Arizona Republic* published an article which stated in part:

There's no doubt in Pat Neal's mind about what is causing a $6 million city warehouse to sink.

The problem is a faulty analysis of the soil under the building, said Neal, the city's inspection-services director.

. . . .

The original report, done by Western Technologies in July 1984, determined a safe bearing value of 3,000 pounds per cubic foot.

. . . .

Neal said construction of footings for the building at 9191 East San Salvador, east of Pima Road and south of Shea Boulevard, was based on the original report. The building settled up to two inches in 44 of its 90 exterior concrete support footings. Settling of up to a half-inch is considered normal.

Western commenced this action against Neal and his wife on August 14, 1985. Western's second amended complaint alleged that Neal defamed Western on three occasions by falsely charging it with incompetence, negligence, below-standard work and having committed errors in performing its soils analysis at the project site. The complaint sought general damages of $500,000, special damages of $30,000, and punitive damages.

Neal moved for summary judgment, acknowledging that Neal had told the press that the settling problem resulted from errors in Western's soils analysis, and arguing that the Neals were qualifiedly immune from liability for Neal's statements. The trial court granted the Neals' motion for summary judgment without stating its reasons. This timely appeal followed entry of formal judgment for the Neals.

*The Test Established by Chamberlain v. Mathis for Qualified Immunity of an Executive Public Official*

■ The parties and this court agree that *Chamberlain v. Mathis*, 151 Ariz. 551, 729 P.2d 905 (1986) governs the determination of whether Neal, as an executive public official, was protected as a matter of law by a qualified immunity when he made defamatory statements concerning Western. Much of the parties' dispute on appeal concerns the question of what exactly is the legally correct formulation of the test established in *Chamberlain*. Deriving that formulation requires an analysis of the supreme court's opinion in that case.

In *Chamberlain* five employees of the Arizona Department of Health Services brought a defamation action against Don-

ald Mathis, the department's director. The plaintiffs, who were the internal audit staff of the Arizona Health Care Cost Containment System (AHCCCS), alleged that Mathis had defamed them by referring to them in the presence of others as incompetent, unqualified and uninformed. The trial court dismissed the complaint, holding that Mathis enjoyed an absolute privilege. This court reversed, holding that Mathis was not entitled to absolute privilege and that the question of whether he was entitled to "high level executive" immunity was a question of fact for the jury.

On petition for review, our supreme court also rejected the view that an absolute immunity was appropriate in the case before it, and held that Mathis was entitled only to protection by a qualified immunity. The court stated:

> The case for absolute official immunity is premised on the *assumption* that the possibility of inquiry into official motives or conduct will deter proper and necessary official action.
>
> . . . .
>
> However, after we limited government immunity and granted police officers and members of the parole board qualified, rather than absolute, immunity, neither government, law enforcement, nor the parole system came to a standstill. We are therefore reluctant to base a rule that eliminates both deterrence of public officials and compensation of victims on such speculative grounds.
>
> . . . .
>
> We believe that in the vast majority of cases, qualified immunity will adequately protect state executive officials.

151 Ariz. at 558, 729 P.2d at 912 (emphasis in original; citations omitted).

The court also recognized, however, that if qualified immunity entailed allowing plaintiffs to force public officials to engage in intensive discovery and cumbersome, time-consuming trials based on the mere allegation of malice, qualified immunity would afford executive public officials insufficient protection. The court therefore approved a modified form of qualified immunity for such officials:

We believe the negative aspects of suits against public officials will be minimized if plaintiffs, instead of merely alleging subjective malice, are required to establish proof of *objective* malice. Thus, in a defamation case, qualified immunity will protect a public official if the facts establish that a reasonable person, with the information available to the official, "could have formed a reasonable belief that the defamatory statement in question was true and that the publication was an appropriate means for serving the interests which justified the privilege." Handler & Klein, *The Defense of Privilege in Defamation Suits against Government Executive Officials*, 74 HARV.L.REV. 44, 68 (1960); *see also Harlow v. Fitzgerald*, 457 U.S. [800] at 816–17, 102 S.Ct. [2727] at 2737–39 [73 L.Ed.2d 396] [1982].

Although a subjective inquiry may suffice in most common-law actions, we believe it is inappropriate for public officials. The loss of time and expense incurred by claims brought against public officials will be minimized by avoiding lengthy discovery procedures that delve into the mind of the defendant in an attempt to ascertain his subjective motives.

. . . .

In our view, the adoption of an objective test for determining malice, use of rigid pretrial scrutiny to eliminate frivolous claims, *cf. Anderson v. Liberty Lobby, Inc.,* [477] U.S. [242], 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and willingness of trial judges to impose sanctions under Rule 11 for claims that are frivolous or intended to harass will provide sufficient protection against the perils described in *Barr v. Mateo* [, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) ]. At the same time, the adoption of a general rule of qualified immunity for executive government officials will deter those who would intentionally misuse power and will compensate those who are wronged by abuse of power. *Harlow v. Fitzgerald,* 457 U.S. at 819, 102 S.Ct. at 2739.

151 Ariz. at 559, 729 P.2d at 913 (footnotes omitted; emphasis in original). Concerning the objective standard of whether a reasonable person with the information available to the official could have formed a reasonable belief that the defamatory statement in question was true, the supreme court offered this qualification:

> Of course, this objective standard does not shield a public official who *knew* his statements were false, even though a reasonable person in the official's situation may have had reasonable grounds for believing the statements were true.

*Id.* at 559, n. 6, 729 P.2d at 913, n. 6 (emphasis in original).

At the close of its opinion in *Chamberlain*, the supreme court summarized its holding as follows:

> We hold that Mathis is entitled to qualified immunity from liability for his allegedly defamatory statements concerning plaintiffs. He forfeits his immunity if, and only if, he (1) acted outside the outer perimeter of his required or discretionary functions, or (2) acted with malice in that he knew his statements regarding plaintiffs were false or acted in reckless disregard of the truth. The reasonableness of Mathis's conduct should be measured by an objective standard. *Ante* at 558–559; 729 P.2d at 912–913.

*Id.* at 560, 729 P.2d at 914.

On the surface, the objective standard of whether a reasonable person could have formed a reasonable belief that the statement was true differs conceptually from the rule that a defendant executive public official forfeits his qualified immunity if he spoke knowing that his statement about the plaintiffs was false or "acted in reckless disregard of the truth," especially in view of the well-defined meaning the latter standard takes on in the distinct area of defamation actions brought by public officials as plaintiffs. *See New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Dombey v. Phoenix Newspapers, Inc.,* 150 Ariz. 476, 724 P.2d 562 (1986). From this apparent ambiguity in *Chamberlain,* Western argues for a different formulation of the qualified immunity rule, derived from an elaborate expansion and synthesis of the two apparently different standards. Western notes that in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), which arose in a defamation action brought by a public official, the United States Supreme Court observed that "[reckless disregard for the truth] may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 268. Western then argues:

> *Mathis'* "objective test" for ascertaining the existence of a triable issue must be evaluated in light of *Mathis'* actual malice standard for determining an abuse of qualified immunity.
>
> . . . .
>
> The second prong of the actual malice standard, whether the official "acted in reckless disregard of the truth," constitutes the focal point of the objective test. In correlating the objective test's artificial reasonable man with the actual malice standard, the question posited for determining whether a genuine issue of disputed fact existed on the record before the lower court was whether a reasonable person in Neal's position, with the same information *available* to Neal, could have entertained a serious doubt as to the truth of the defamatory statements. If, based upon the information available, the reasonable person had "obvious reasons to doubt" (*St. Amant, supra* at p. 40) and, thus, could have entertained serious doubts, he could *not* have also " 'formed a reasonable belief that the defamatory statement[s] in question [were] true' " (*Mathis, supra* at p. 52).

The only way for summary judgment to have been appropriate is if, from all the evidence presented, circumstantial and otherwise, the *only* inference reasonably drawn from the undisputed facts is that no reasonable person in Neal's position could have entertained a serious doubt as to the truthfulness of Neal's statements defaming Western. If other inferences could have been reasonably

drawn, summary judgment was inappropriate.

(Emphasis in original).

In our opinion, Western's analysis fundamentally misinterprets *Chamberlain.* Western's formulation of the qualified immunity standard, focusing on whether a reasonable person in the position of the defendant public executive official could have entertained serious doubts about the truth of his allegedly defamatory statements, rests on the proposition that by using the "knowledge of falsity—reckless disregard for truth" language to summarize its holding, the *Chamberlain* court intended to import into the qualified immunity area all the analytic details and ramifications evolved over the years in the federal and state case law governing what a public official must prove in a defamation case to recover damages as a plaintiff. Other than the *Chamberlain* court's use of the "reckless disregard" language, we find no support at all in the *Chamberlain* opinion for this conceptual detour. *Chamberlain* does not attempt to draw direct support from any of the constitutional case law on which Western has based its proposed formulation. The *Chamberlain* opinion focuses exclusively on antecedent case law and commentary concerning a defendant public official's qualified immunity from defamation liability, and unmistakably adopts an objective test that accords such a public official the protection of qualified immunity whenever the facts establish that a reasonable person with the information available to the official could reasonably have believed the defamatory statement he published was the truth. Western's opposing formulation, which would require the defendant public official to prove that no reasonable person in his position could have entertained a serious doubt about the truth of his statement, actually changes the meaning of the objective test set forth in the core of the *Chamberlain* opinion, and, contrary to *Chamberlain's* balanced analysis, would make it appreciably more difficult for an executive public official to establish that he was qualifiedly immune.

In our view the apparent ambiguity in *Chamberlain* is resolvable within the four corners of the court's opinion. As we noted above, the court's discussion of the "reasonable person-reasonable belief" test contained a footnote reference making it clear that a public official who actually knew his statement was false would not be protected by qualified immunity even if a reasonable person in his situation would have had reasonable grounds for believing his statement was true. 151 Ariz. at 559 n. 6, 729 P.2d at 913 n. 6. That reference can be viewed as corresponding to the first prong of the court's concluding statement, that a defendant executive public official forfeits his qualified immunity if he spoke knowing that his statement regarding the plaintiffs was false. We therefore think it reasonable to construe the court's second prong— that the official also forfeits his immunity if he "acted in reckless disregard of the truth"—as merely a shorthand reference to the court's earlier specific holding that qualified immunity will protect a public official if a reasonable person with the information available to him could reasonably have believed his defamatory statement was true. The *Chamberlain* court's direct reference to this objective standard, immediately following its reference to "reckless disregard of the truth," 151 Ariz. at 560, 729 P.2d at 914, strongly supports this interpretation. Moreover, *Chamberlain's* "reasonable person-reasonable belief" standard is both analytically congruent with the opinion's systematic exposition of executive qualified immunity and easier to understand and apply than the "serious doubt" test urged by Western.

### Existence of Triable Factual Issues

■ Both parties have apparently assumed throughout the briefing that the resolution of the question of which alternative formulation of the *Chamberlain* standard for qualified executive immunity is correct will be dispositive—that if the correct formulation is the "reasonable person-reasonable belief" test, summary judgment for Neal should be affirmed, but if the "serious doubt" formulation prevails, the matter should be reversed and remanded

for trial. We do not share that view. Although *Chamberlain* made it clear that it adopted the objective "reasonable person-reasonable belief" standard in part to further the goal of keeping public officials available to perform their duties, *Chamberlain* surely does not stand for the proposition that the outcome of applying that standard must always be the entry of summary judgment for one side or the other. In particular, *Chamberlain* did not purport to alter the settled principle that summary judgment is improper if conflicting inferences may be drawn from the facts. *Northern Contracting Co. v. Allis–Chalmers Corp.*, 117 Ariz. 374, 573 P.2d 65 (1977); *Morelos v. Morelos*, 129 Ariz. 354, 631 P.2d 136 (App.1981).

We have reviewed the entire record in this case. In doing so, we have analytically segregated (1) the proposition that Western shared part of the responsibility for the settlement problem with a number of others, which is not what Neal said, from (2) the proposition that Western's soils analysis was "the problem" or "the main cause" of it, which is the gist of Neal's actual statements. It would be easy to say from this record that as a matter of law a reasonable person with the information available to Neal could have formed a reasonable belief that Western shared responsibility for the settlement problem with others. We cannot say as a matter of law, however, that a reasonable person in that situation could have formed a reasonable belief that Western's soils analysis was primarily to blame.

It is certainly true that some of the communications available to Neal would support an inference that a reasonable person in Neal's position could reasonably have believed that Western's initial soils report was the primary cause of the settling problem. Wyatt explicitly told Neal that that was his opinion. Moreover, Semmens' April 25, 1985 report suggested that Western's original soils report had incorrectly treated certain soil material from the project site as if it were uniformly homogeneous. Further, Bob Crossley of SH & B told Wyatt that he believed Western's

"plate load" tests, the results of which were reported to Neal on May 20, 1985, were founded on a mathematical error and thus wrongly confirmed Western's original evaluation of the soil's bearing strength. Wyatt also informed Neal on May 20, 1985 that because footing D–5 had substantially settled at a relatively light soil pressure, Western's original soils recommendations were a "significant factor in the problem...." Further, both SH & B and Speedie & Associates analyzed the soil on the site as substantially more sensitive to settlement under increasing moisture conditions than did Western's original soils report.

At the same time, we do not find that these bits of information, considered in isolation, may under the *Chamberlain* approach be relied upon as establishing *as a matter of law* that a reasonable person in Neal's position could have formed a reasonable belief that Western's soils report was the main cause of the settlement problem. In answering the question of whether a reasonable person could reasonably have believed the official's defamatory statement was true, "the information available to the official" must be taken into account. *Chamberlain v. Mathis*, 151 Ariz. at 559, 729 P.2d at 913. In this case a trier of fact could conclude that the statements and information Neal relies on in support of summary judgment are more important under the circumstances of the case than those on which Western relies, and demonstrate that a reasonable person in Neal's position could reasonably have believed what Neal told the press. But a trier of fact could also determine that other items of information available to Neal show that a reasonable person in Neal's position could not reasonably have believed that Western's soils analysis was solely or primarily at fault for the settlement problem. It was never disputed in the trial court that Western's original soils report expressly assumed that a much lighter building would be constructed on the project site than was ultimately designed for it. Western's report also emphasized and warned that the infiltration of water into utility and foundation excavations, which actually occurred during con-

442

struction, must not be allowed to occur. It further recommended that "earth work relative to structural supports should be accomplished under observation and testing directed by the geotechnical engineer," which undisputedly did not happen. Moreover, Semmens' report of April 25, 1985, which noted an apparent error in Western's original soils report, also noted that in a number of cases foundation loads were double or greater than the maximum amounts allowed in Western's report; that Western was not asked to inspect the footings before they were cast, contrary to its recommendation; and that foundation design problems existed that would have to be addressed. Further, Wyatt's letters of May 20 and 21, 1985 to Neal, though noting that Western's soils recommendations were a significant factor in the problem, also indicated that eccentric loading resulting in high unit soil pressures on one side or corner of the footings was still a "major factor in the overall problem," and additionally faulted structural engineering design failures, failure to consult Western about deviations from its recommendations, and contractor errors. Similarly, SH & B's May 31, 1985 report to Neal, which estimated inconsistently with Western's original report "that settlements of about two to three inches would occur upon wetting for concentrated loads of 60 to 75 kips even if very low bearing pressures were involved in the design," also stated:

> If light to moderately loaded structures are supported on shallow spread-type footings bearing on these deposits, settlements would be within tolerable limits as long as the soils remain dry.

SH & B's report did not indicate an awareness that Western's original report assumed a structure lighter than "tilt wall construction" would be built, and also warned that the site should be kept dry during and after construction. The report of Speedie & Associates dated June 25, 1985 similarly indicated that the soils at the site were more sensitive to moisture than Western's original report suggested, but did not evidence awareness of any of the express limitations that the report contained.

We conclude that the record before the trial court on Neal's motion for summary judgment supported conflicting inferences on the question of whether a reasonable person with the information available to Neal could reasonably have believed that Western's original soils report was the sole or primary cause of the settlement problem at the project site. We accordingly reverse the judgment and remand for further proceedings. Because of our disposition of the appeal, we deny Neal's request for sanctions against Western, pursuant to Rule 11, Arizona Rules of Civil Procedure, and their request for attorney's fees.

The summary judgment is reversed and remanded for further proceedings consistent with this opinion.

CONTRERAS, P.J., and JACOBSON, J., concur.